B. 104
(Rev.8/99)

# ADVERSARY PROCEEDING SHEET
(Instructions on Reverse)

ADVERSARY PROCEEDING NUMBER
(For Court Use Only)

| PLAINTIFFS | DEFENDANTS |
|---|---|
| GERALD H. DAVIS, Trustee of the Bankruptcy Estate of Mark F. Augusta<br><br>Address | Miller & Schroeder, Inc.; Miller & Schroeder Financial Inc.; Miller & Schroeder Investments, Inc.; Securities Resolution Corp.; see attached continued list<br><br>Address |
| ATTORNEYS (Firm Name, Address, and Telephone Number)<br>Gary B. Rudolph, Esq.<br>SPARBER RUDOLPH ANNEN, APLC<br>701 "B" Street, Suite 1000<br>San Diego, CA 92101-8109<br>(619) 239-3600 | ATTORNEYS (if known) |

**PARTY** (Check one box only)  ☐ 1 U.S. PLAINTIFF   ☐ 2 U.S. DEFENDANT   ☒ 3 U.S. NOT A PARTY

**CAUSE OF ACTION** (Write a brief statement of cause of action, including all U.S. statutes involved)

Negligence; Breach of Fiduciary Duty; Constructive Fraud; Intentional Interference; Negligent Interference with Prospective Economic Advantage; Interference with Contractual Relations; Aiding & Abetting Breach of Fiduciary Duty; Breach of Contract; Breach of Contract - Indemnity; Violation of Labor Code §2802; Unlawful Business Practices/Unfair Competition; Equitable Indemnity and Declaratory Relief; To Set Aside Fraudulent Conveyances [Civil Code §3439.01]; and Conspiracy.

## NATURE OF SUIT
(Check the one most appropriate box only)

☐ 454 To recover money or property

☐ 435 To determine validity, priority, or extent of a lien or other interest in property

☐ 458 To obtain approval for the sale of both the interest of the estate and of a co-owner in property

☐ 424 To object or to revoke a discharge 11 U.S.C. § 727

☐ 455 To revoke an order of confirmation of a Chapter 11 or Chapter 13 Plan

☐ 426 To determine the dischargeability of a debt 11 U.S.C. § 523

☐ 434 To obtain an injunction or other equitable relief

☐ 457 To subordinate any allowed claim or interest except where such subordination is provided in a Plan

☐ 456 To obtain a declaratory judgment relating to any of the foregoing causes of action

☐ 459 To determine a claim or cause of action removed to a bankruptcy court

☒ 498 Other (specify) Breach of Contract

**ORIGIN OF PROCEEDINGS**
(Check one box only)

☒ 1 Original Proceeding   ☐ 2 Removed Proceeding   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from Another Bankruptcy Court   CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND**  NEAREST THOUSAND $ 10,000,000.00   OTHER RELIEF SOUGHT   ☒ JURY DEMAND

## BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES

NAME OF DEBTOR
MARK FREDERICK AUGUSTA and BRIDGET MARY A

BANKRUPTCY CASE NUMBER:
02-06093-M7

DISTRICT IN WHICH CASE IS PENDING
SOUTHERN

DIVISIONAL OFFICE

NAME OF JUDGE
Hon. James W. Meyers

## RELATED ADVERSARY PROCEEDING (IF ANY)

| PLAINTIFF<br>Heritage Bonds | DEFENDANT<br>US Trust Corporation et al | ADVERSARY PROCEEDING NUMBER:<br>02-ML-1475-DT |
|---|---|---|
| DISTRICT<br>CENTRAL DISTR OF CA | DIVISIONAL OFFICE<br>WESTERN DIVISION | NAME OF JUDGE<br>DICKRAN TEVRIZIAN |

**FILING FEE**
(Check one box only)   ☒ FEE ATTACHED   ☐ FEE NOT REQUIRED   ☐ FEE IS DEFERRED

| DATE<br>JUNE 15, 2004 | PRINT NAME<br>Gary B. Rudolph, Esq. | SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>/s/ Gary B. Rudolph |
|---|---|---|

B104

| In Re: | CASE NUMBER: |
| MARK FREDERICK AUGUSTA and BRIDGET MARY AUGUSTA | 02-06093-M7 |

Continued List of Defendants:

SRC HOLDING COMPANY; MARSHALL ACQUISITIONS GROUP, INC.; MARSHALL, MILLER & SCHROEDER, INC.; MARSHALL MILLER & SCHROEDER FINANCIAL, INC.; MARSHALL GROUP, INC.; MM&S INVESTMENTS CORPORATION; JIM ARIAS; JOHN M. CLAREY; KENNETH E. DAWKINS; VICTOR P. DHOOGE; JAMES F. OLUGOSCH; PAUL R. EKHOLM; KEN HALLORAN; EDWARD J. HENTGES; JAMES E. IVERSON; KENNETH R. LARSEN; JIM MORRELL; TOM NESLON; JOHN PETERSON; WILLIAM SEXTON; JEROME A. TABOLICH; STEVEN W. ERICKSON; JOEL T. BOEHM; SABO & GREEN; ATKINSON, ANDELSON, LOYA, RUUD & ROMO; HEALTHCARE HOLDINGS, LLC; CARECONTINUUM, LLC; HERITAGE HOUSING DEVELOPMENT, INC.; AFFILIATED METROPOLITAN CONTRACTORS, INC.; VALUATION COUNSELORS GROUP, INC,; HERITAGE GERIATRIC IX; HERITAGE HOUSING DEVELOPMENT, INC.; HERITAGE HEALTHCARE OF AMERICA, INC.; HERITAGE RANCHO HEALTHCARE, INC.; HERITAGE CARE OF CHICAGO, INC.; HERITAGE GERIATRIC HOUSING DEVELOPMENT IX, INC.; HERITAGE CARE OF SARASOTA, INC.; BMHC CORP.; ROBERT KASIRER; U.S. TRUST COMPANY OF TEXAS, N.A.; U.S. TRUST COMPANY, N.A.; THE BANK OF NEW YORK, INC.; DEBRA KASIRER; JEROLD V. GOLDSTEIN; EMERY RUBIN; LARRY A. RUBIN; VIRGIL LIM; ONOFRIO BERTOLINI; BERMAN & BERTONLINI, INC.; aka BERMAN & ASSOCIATES; LEO DIERCKMAN; BHMC CORP.; JDDJ HOLDINGS, L.P.

B-104
(Rev. 8/99)

## ADVERSARY PROCEEDING COVER SHEET (Reverse Side)

This cover sheet must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney) and submitted to the Clerk of the Court upon the filing of a complaint initiating an adversary proceeding.

The cover sheet and the information contained on it *do not* replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. This form is required for the use of the Clerk of the Court to initiate the docket sheet and to prepare necessary indices and statistical records. A separate cover sheet must be submitted to the Clerk of the Court for each complaint filed. The form is largely self-explanatory.

**Parties.** The names of the parties to the adversary proceeding *exactly* as they appear on the complaint. Give the names and addresses of the attorneys if known. Following the heading "Party," check the appropriate box indicating whether the United States is a party named in the complaint.

**Cause of Action.** Give a brief description of the cause of action including all federal statutes involved. For example, "Complaint seeking damages for failure to disclose information, Consumer Credit Protection Act, 15 U.S.C. § 1601 et seq.," or "Complaint by trustee to avoid a transfer of property by the debtor, 11 U.S.C. § 544."

**Nature of Suit.** Place an "X" in the appropriate box. Only one box should be checked. If the cause fits more than one category of suit, select the most definitive.

**Origin of Proceedings.** Check the appropriate box to indicate the origin of the case:

      1. Original Proceeding.
      2. Removed from a State or District Court.
      4. Reinstated or Reopened.
      5. Transferred from Another Bankruptcy Court.

**Demand.** On the next line, state the dollar amount demanded in the complaint in thousands of dollars. For $1,000, enter "1," for $10,000, enter "10," for $100,000, enter "100," if $1,000,000, enter "1000." If $10,000,000 or more, enter "9999." If the amount is less than $1,000, enter "0001." If no monetary demand is made, enter "XXXX." If the plaintiff is seeking non-monetary relief, state the relief sought, such as injunction or foreclosure of a mortgage.

**Bankruptcy Case in Which This Adversary Proceeding Arises.** Enter the name of the debtor and the docket number of the bankruptcy case from which the proceeding now being filed arose. Beneath, enter the district and divisional office where the case was filed and the name of the presiding judge.

**Related Adversary Proceedings.** State the names of the parties and the six-digit adversary proceeding number from any adversary proceeding concerning the same two parties or the same property currently pending in any bankruptcy court. On the next line, enter the district where the related case is pending and the name of the presiding judge.

**Filing Fee.** Check one box. The fee must be paid upon filing unless the plaintiff meets one of the following exceptions. The fee is not required if the plaintiff is the United States government or the debtor. If the plaintiff is the trustee or a debtor in possession and there are no liquid funds in the estate, the filing fee may be deferred until there are funds in the estate. (In the event no funds are ever recovered for the estate, there will be no fee). There is no fee for adding a party after the adversary proceeding has been commenced.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the right of the last line of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is *pro se,* that is, not represented by an attorney, the plaintiff must sign.

The name of the signatory must be printed in the box to the left of the signature. The date of the signing must be indicated in the box on the far left of the last line.

1

2

3

4  Richard J. Annen, Esq. (SB #91956)
   Todd R. Gabriel, Esq. (SB #119750)
5  Michael W. Jacobs, Esq. (SB #174885)
   SPARBER RUDOLPH ANNEN, APLC
6  701 "B" Street, Suite 1000
   San Diego, CA 92101-8109
7  Telephone:    (619) 239-3600
   Facsimile:    (619) 239-5601
8

9  Attorneys for Plaintiff Gerald H. Davis, Chapter 7 Trustee

10
                  **UNITED STATES BANKRUPTCY COURT**
11
                  **SOUTHERN DISTRICT OF CALIFORNIA**
12
13  In re                                  ) Case No. 02-06093-M7
                                           )
14  MARK FREDERICK AUGUSTA [SSN -)  Adv. Case No.
    4609 and BRIDGET MARY AUGUSTA)
15  [SSN -3065],                           ) **COMPLAINT FOR:**
                                           )
16                                         ) **1.    Negligence;**
                                           ) **2.    Breach of Fiduciary Duty;**
17          Debtors                        ) **3.    Constructive Fraud;**
    _____       ) **4.    Intentional Interference**
18  GERALD H. DAVIS, Trustee of the) **5.    Negligent Interference with**
    Bankruptcy Estate of Mark F. Augusta,  )        **Prospective Economic Advantage;**
19                                         ) **6.    Interference with Contractual**
                Plaintiff,                 )        **Relations;**
20                                         ) **7.    Aiding & Abetting Breach of**
           vs.                             )        **Fiduciary Duty;**
21                                         ) **8.    Breach of Contract;**
    MILLER & SCHROEDER, INC.;              ) **9.    Breach of Contract - Indemnity;**
22  MILLER & SCHROEDER FINANCIAL,) **10.   Violation of Labor Code §2802;**
    INC.; MILLER & SCHROEDER               ) **11.   Unlawful Business Practices/Unfair**
23  INVESTMENTS, INC.; SECURITIES          )        **Competition;**
    RESOLUTION CORP.; SRC HOLDING) **12.   Equitable Indemnity &**
24  COMPANY; MARSHALL                      )        **Declaratory Relief;**
    ACQUISITIONS GROUP, INC.;              ) **13.   To Set Aside Fraudulent**
25  MARSHALL, MILLER &                     )        **Conveyances; and**
    SCHROEDER, INC.; MARSHALL              ) **14.   Conspiracy.**
26  MILLER & SCHROEDER FINANCIAL,)
    INC.; MARSHALL GROUP, INC.;            )        **Jury Trial Demanded**
27  MM&S INVESTMENTS                       )
    CORPORATION; JIM ARIAS; JOHN           )
28  M. CLAREY; KENNETH E.                  )
    DAWKINS; VICTOR P. DHOOGE;             )
    JAMES F. OLUGOSCH; PAUL R.             )
    EKHOLM; KEN HALLORAN;                  )

| | |
|---|---|
| 1 | EDWARD J. HENTGES; JAMES E. ) |
| | IVERSON; KENNETH R. LARSEN; ) |
| 2 | JIM MORRELL; TOM NESLON; JOHN ) |
| | PETERSON; WILLIAM SEXTON; ) |
| 3 | JEROME A. TABOLICH; STEVEN W. ) |
| | ERICKSON; JOEL T. BOEHM; SABO ) |
| 4 | & GREEN; ATKINSON, ANDELSON, ) |
| | LOYA, RUUD & ROMO; ) |
| 5 | HEALTHCARE HOLDINGS, LLC; ) |
| | CARECONTINUUM, LLC; ) |
| 6 | HERITAGE HOUSING ) |
| | DEVELOPMENT, INC.; AFFILIATED ) |
| 7 | METROPOLITAN CONTRACTORS, ) |
| | INC.; VALUATION COUNSELORS ) |
| 8 | GROUP, INC.; HERITAGE ) |
| | GERIATRIC IX; HERITAGE ) |
| 9 | HOUSING DEVELOPMENT, INC.; ) |
| | HERITAGE HEALTHCARE OF ) |
| 10 | AMERICA, INC.; HERITAGE ) |
| | RANCHO HEALTHCARE, INC.; ) |
| 11 | HERITAGE CARE OF CHICAGO, ) |
| | INC.; HERITAGE GERIATRIC ) |
| 12 | HOUSING DEVELOPMENT IX, INC.; ) |
| | HERITAGE CARE OF SARASOTA, ) |
| 13 | INC.; BMHC CORP.; ROBERT ) |
| | KASIRER; U.S. TRUST COMPANY ) |
| 14 | OF TEXAS, N.A.; U.S. TRUST ) |
| | COMPANY, N.A.; THE BANK OF ) |
| 15 | NEW YORK, INC.; DEBRA KASIRER; ) |
| | JEROLD V. GOLDSTEIN; EMERY ) |
| 16 | RUBIN; LARRY A. RUBIN; VIRGIL ) |
| | LIM; ONOFRIO BERTOLINI; ) |
| 17 | BERMAN & BERTONLINI, INC.; aka ) |
| | BERMAN & ASSOCIATES; LEO ) |
| 18 | DIERCKMAN; BHMC CORP.; JDDJ ) |
| | HOLDINGS, L.P. ) |
| 19 | ) |
| 20 | / / / |
| 21 | / / / |
| 22 | / / / |
| 23 | / / / |
| 24 | / / / |
| 25 | / / / |
| 26 | / / / |
| 27 | / / / |
| 28 | / / / |

2

COMES NOW, Plaintiff Gerald H. Davis, Chapter 7 Trustee, and alleges as follows:

# Parties

## 1. Plaintiff.

1.   Plaintiff is the Chapter 7 Trustee of the bankruptcy estate of Mark Frederick Augusta (Augusta) and Bridget Mary Augusta (collectively "Debtors").   On June 19, 2002, the Debtors filed for relief pursuant to the provisions of Chapter 11 of Title 11, of the United States Bankruptcy Code, Southern District of California.   The Chapter 11 was converted to a Chapter 7 on March 11, 2004, and Gerald H. Davis was appointed Chapter 7 Trustee ("Trustee") of the chapter 7 Estate.

2.   Debtor Augusta was formerly a registered representative of Miller & Schroeder Financial Inc. working out of its Solana Beach, California office.   At all times herein he was an employee of the Miller & Schroeder Defendants.   All actions of Augusta herein occurred during, and/or in direct consequence of, the discharge of his duties to his employers, and in direct consequence of his obedience to the practices, rules, and directions of his employers, the Miller & Schroeder Defendants.

## 2. Miller & Schroeder Corporate Defendants.

3.   Plaintiff is informed and believes and based thereon alleges that Miller & Schroeder, Inc. at all relevant times was the parent entity to Miller & Schroeder Financial, Inc. and Miller & Schroeder Investments, Inc.

4.   Plaintiff is informed and believes and based thereon alleges that at all relevant times herein, Miller & Schroeder, Inc., was a Minnesota corporation doing business in San Diego County, from offices in Solana Beach, as a securities firm underwriting and selling municipal bonds. Miller & Schroeder, Inc. was issued a broker-dealer certificate in California in 1984 authorizing it to offer and sell securities in compliance with the law. Miller & Schroeder, Inc. was a member of the National Association of Securities Dealers ("NASD"), a self-regulatory organization, from 1976 until 2001. Miller & Schroeder, Inc. has at all times herein held itself out to the public as a regulated entity composed of

1  securities professionals specializing in municipal bonds.  Augusta's clients all had accounts

2  with Miller & Schroeder, Inc. and all of the actions taken by Augusta were performed in

3  accordance with Augusta's duties as a registered representative of the firm.

4      5.   Plaintiff is informed and believes and based thereon alleges that defendant Miller &

5  Schroeder Investments, Inc. ("MSI") was a subsidiary corporation to Miller & Schroeder,

6  Inc., concentrating in the area of loan participations, sales and servicing, and mortgage

7  banking.  At all times it did business in, and was qualified to do business in, the County of

8  San Diego, State of California.  At all times herein it was part of, and indistinguishable

9  from, Miller & Schroeder, Inc. and was controlled by other Miller & Schroeder defendants

10  both individual and corporate.

11      6.   Plaintiff is informed and believes and based thereon alleges that defendant Miller &

12  Schroeder Financial, Inc. ("MSF") was a subsidiary corporation to Miller & Schroeder, Inc.,

13  concentrating in the areas of public finance, bond sales, bond trading, and corporate finance.

14  At all times it did business in, and was qualified to do business in, the County of San Diego,

15  State of California.  At all times herein it was part of, and indistinguishable from, Miller &

16  Schroeder, Inc. and was controlled by other Miller & Schroeder defendants.  Defendant

17  Miller & Schroeder Financial, Inc. was named as the sole underwriter for all of the Heritage

18  entities.

19      7.   Miller & Schroder, Inc. is not named as a Defendant because it filed for Chapter 7

20  Bankruptcy relief in Minnesota in January 2002 and the automatic stay pursuant to 11

21  U.S.C. § 362.  All the Miller & Schroeder entities are collectively referred to as Miller &

22  Schroeder.

23      8.   Plaintiff is informed and believes and based thereon alleges that Miller & Schroeder,

24  Inc. changed its name to Securities Resolution Corporation and then filed for bankruptcy

25  in January of 2002.   At all relevant times herein Miller & Schroeder has been a

26  wholly-owned subsidiary controlled by Miller & Schroeder, Inc. which changed its name

27  to SRC Holding Company and filed for bankruptcy in January of 2002.  After January 2002

28  in order to avoid liability for numerous lawsuits and securities arbitrations, which it and all

the Miller & Schroeder principals, managers, officers, and directors knew were both pending and forthcoming, alleging that the Heritage Bonds had been improperly, negligently, and/or fraudulently researched, prepared, offered, operated, and/or sold. The Miller & Schroeder Defendants then attempted several other name and asset transfers to such other successor companies as Marshall Acquisitions Group, Inc.; Marshall, Miller & Schroeder, Inc.; MM&S Investments Corporation and MM&S Financial, Inc. Some of these entities are in bankruptcy in Minnesota. The true purpose of these corporate name changes and asset transfers, was to alienate company assets from liabilities arising out of liability to both Augusta and Augusta's clients and/or Miller & Schroeder investors for fraudulent bond sales, and to avoid Miller & Schroeder's obligations to indemnify Augusta for Defendants wrongful actions.

9.   Plaintiff is informed and believes and based thereon alleges that Defendant the Marshall Group, Inc. is the successor in interest to the Miller & Schroeder Individual and Corporate Defendants. It is a Minnesota corporation with headquarters in Minneapolis. It does business in several states, including Florida, Arizona, Illinois, Texas, and in California where it does business as Defendant Minnesota Marshall Group, Inc. or Marshall Group, Inc. It has offices in Solana Beach, CA, and these offices are the same offices from which Miller & Schroeder did business prior to the bogus corporate moves described above. Its telephone number is the same as that of Miller & Schroeder. The sole purpose behind the formation of this new entity was to enable the Defendants to seize and keep and hide the assets of Miller & Schroeder while alienating and shedding the obligations and liabilities, including the liabilities and indemnity obligations to Augusta, which Miller & Schroeder owed and knew it would owe. In short, a fraudulent transfer.

10.   At all relevant times herein the Miller & Schroeder corporate Defendants were inadequately capitalized and had no genuine or separate existence, but were and are used and are existing for the sole purpose of permitting all the Miller & Schroeder Defendants to transact a portion or portions of their business under separate guises.

/ / /

11.  At all relevant times herein Miller & Schroeder and the Miller & Schroeder Individual Control Defendants completely controlled, dominated, managed, and operated the individual and corporate entities together and intermingled their assets together to suit the convenience of said Defendants, such that the individuality or separateness of said Defendants did not exist but was instead a ruse to avoid liability for their actions and capacities alleged herein.

12.  For example, the Miller & Schroeder Defendants manipulated the financial books and records of separate subsidiaries Miller & Schroeder Investments (MSI) and Miller & Schroeder Financial (MSF), to make it appear as though MSF met the SEC-mandated Net Capital Requirements for brokerage firms when in fact it would not have met those requirements and hence would not have been allowed to act as underwriters for the subject municipal bonds and/or others.  The Miller & Schroeder Defendants simply transferred certain cash assets (i.e. the "float" on payments from MSI's loan participations) of MSI back-and-forth between the books of MSI and MSF when convenient or necessary in order to boost MSF's appearance of adequate net capital to make the Heritage Bonds and other bonds underwritings.  This also had the effect of deceiving plaintiff, other employees, and the firms' customers as to the capital base and financial strength of the company.

13.  And when the Miller & Schroeder Defendants sold MSF's assets, such sale was not an "arm's length" sale but was instead a ruse which enabled them to use the proceeds from that sale ($1,000,000) not to pay liabilities to investors or indemnify their brokers as they'd promised.  Instead, they gave that money to Defendant Sexton purportedly to repay part of a $4.4 million dollar loan he had made to the companies, along with a note for $3.5 million. That "note" should have been subordinate to Defendants obligations to plaintiff and his clients. Sexton promptly "re-loaned" that money to the sham successor entities, Defendants herein.  In this fashion and others the Miller & Schroeder Defendants looted Miller & Schroeder and retained all their assets, while attempting to avoid their liabilities.  This transfer of funds and others was a fraudulent conveyance, made as it was in the face of pending liability to investors and plaintiff.

14.   The acts of each individual and corporate Miller & Schroeder entity were and are the acts of all the Miller & Schroeder Defendants.

15.   Failure to pierce the corporate veil(s) would promote injustice and, based thereon, the Miller & Schroeder Defendants are jointly and severally liable.

### 3. Miller & Schroder Individual Control Defendants.

16.   Plaintiff is informed and believes and based thereon alleges that Defendant Jim Arias is a resident of New Mexico.  At all relevant times herein Defendant Arias was a director and control person of the Miller & Schroeder Corporate Defendants, and caused and/or permitted them to commit the actions set forth herein.

17.   Plaintiff is informed and believes and based thereon alleges that Defendant John M. Clarey is a resident of Minnesota.  At all relevant times herein, Defendant Clarey was Executive Vice President, director and  control person of Miller & Schroeder Corporate Defendants, and was also a member of the firm's credit committee, and caused and/or permitted them to commit the actions set forth herein.

18.   Plaintiff is informed and believes and based thereon alleges that Defendant Kenneth E. Dawkins is a resident of Minnesota.  From in or about August 1997 until at least sometime in the year 2000, Defendant Dawkins was a director of Miller & Schroeder and a control person of Miller & Schroeder.

19.   Plaintiff is informed and believes and based thereon alleges that Defendant Victor P. Dhooge has been and is a resident of San Diego County.  At all relevant times herein, Dhooge was employed by Miller & Schroeder as an investment banker at the Solana Beach office.  Defendant Dhooge was a managing agent for Miller & Schroeder.  Defendant Dhooge was, along with Defendant Boehm, responsible for structuring the Heritage Bond offerings, including conducting negotiations with the issuers and Defendant Kasirer and his affiliates.  Defendant Dhooge also assisted in conducting the "due diligence" investigation on behalf of Miller & Schroeder into the merits of the Heritage Bond offerings and the veracity of the representations in the Preliminary Official Statements and the Official

1   Statements for the respective Heritage Bond offerings.  Defendant Dhooge was a control

2   person of Miller & Schroeder.

3       20.   Plaintiff is informed and believes and based thereon alleges that Defendant James

4   F. Dlugosch is a resident of Minnesota.  From in or about August 1997 until at least

5   sometime in the year 2000, Defendant Dlugosch was the principal executive officer of

6   Miller & Schroeder, a director of Miller & Schroeder, and a control person of Miller &

7   Schroeder.

8       21.   Plaintiff is informed and believes and based thereon alleges that Defendant Paul R.

9   Ekholm is a resident of Minnesota.  At all relevant times herein, Defendant Ekholm was an

10  officer and control person of Miller & Schroeder, and was also a member of the firms's

11  credit committee, and caused and/or permitted them to commit the actions set forth herein.

12      22.   Plaintiff is informed and believes and based thereon alleges that Defendant Ken

13  Halloran is a resident of Minnesota, was sales manager of Miller & Schroeder, and served

14  on the company's Credit Committee.  At all relevant time herein Defendant Halloran was

15  director and control person of Miller & Schroeder Corporate Defendants, and caused and/or

16  permitted them to commit the actions set forth therein.

17      23.   Plaintiff is informed and believes and based thereon alleges that Defendant Edward

18  J. Hentges is a resident of Minnesota.  At all relevant times herein, Defendant Hentges was

19  a control person of Miller & Schroeder.

20      24.   Plaintiff is informed and believes and based thereon alleges that Defendant James

21  E. Iverson was at all relevant times herein a resident of San Diego County, and was an

22  officer, director, owner, and supervisor of Defendant Miller & Schroeder.  From the

23  commencement of the Heritage Bond offerings Defendant Iverson was the Chairman of the

24  Board of Miller & Schroeder and was the "partner in charge" of the Solana Beach,

25  California office of Miller & Schroeder since its inception.  Defendant Iverson was also

26  directly responsible for project supervision of all California issues of public finance

27  securities underwritten by Miller & Schroeder and the "investment banking" activities

28  conducted from the Solana Beach, California office of Miller & Schroeder.  In this capacity,

1    Defendant Iverson was responsible for supervising Defendant Victor P. Dhooge, an

2    investment banker working out of the Solana Beach, California office of Miller &

3    Schroeder.  Defendant Iverson, along with Defendants Joel T.  Boehm and Victor Dhooge,

4    was responsible for structuring the Heritage Bond offerings as the underwriter's

5    representative, and conducting "due diligence" investigations on behalf of Miller &

6    Schroeder into the merits of the Heritage Bond offerings and the veracity of the

7    representations contained in the Preliminary Official Statement and Official Statement for

8    each of the respective Heritage Bond offerings.  In or about the summer of 1997, Defendant

9    Iverson sold his stock in Miller & Schroeder, Inc. (the parent of Miller & Schroeder) of

10   which Defendant Iverson owned approximately 48%.  After the sale of his stock, Defendant

11   Iverson continued on pursuant to an agreement with the new ownership to manage and

12   supervise the Solana Beach office of Miller & Schroeder as he always had.  Even after the

13   sale of his stock in Miller & Schroeder, Inc., Defendant Iverson continued to be a control

14   person of Miller & Schroeder.

15       25.   Plaintiff is informed and believes and based thereon alleges that Defendant Kenneth

16   R. Larsen is a resident of Minnesota.  At all relevant times herein, Defendant Larsen was

17   a control person of Miller & Schroeder.

18       26.   Plaintiff is informed and believes and based thereon alleges that Defendant Jim

19   Morrell is a resident of Minnesota.  At all relevant times herein Defendant Morrell was a

20   director and control person of the Miller & Schroeder Corporate Defendants, and caused

21   and/or permitted them to commit some or all of the actions set forth herein.

22       27.   Plaintiff is informed and believes and based thereon alleges that Defendant Tom

23   Nelson is a resident of Montana, and was formerly a resident of Minnesota.  At all relevant

24   times herein Defendant Nelson was an officer and/or director and control person of the

25   Miller & Schroeder Corporate Defendants, and was a member of the firm's credit committee,

26   and caused and/or permitted them to commit the actions set forth herein.

27       28.   Plaintiff is informed and believes and based thereon alleges that Defendant John

28   Peterson is a resident of Minnesota.  At all relevant times herein, Defendant Peterson was

a board member and control person of the Miller & Schroeder Corporate Defendants and caused and/or permitted them to commit the actions herein.

29.   Plaintiff is informed and believes and based thereon alleges that Defendant William Sexton is a resident of Minnesota.  At all relevant times herein Defendant Sexton was a director and control person of the Miller & Schroeder Corporate Defendants, and caused and/or permitted them to commit the actions herein.

30.   Plaintiff is informed and believes and based thereon alleges that Defendant Jerome A. Tabolich is a resident of Minnesota.  At all relevant times herein, Defendant Tabolich was an officer and director and control person of the Miller & Schroeder Corporate Defendants, and was also a member of the firm's credit committee, and caused and/or permitted them to commit the actions set forth herein.

31.   Plaintiff is informed and believes and based thereon alleges that Defendant Steven W. Erickson is a resident of Minnesota.  At all relevant times herein, Defendant Erickson was a control person of Miller & Schroeder.

32.   Defendants Arias, Dawkins, Dhooge, Dlugosch, Ekholm, Halloran, Hentges, Iverson, Larsen, Morrell, Nelson, Peterson, Sexton, Clarey, Tabolich, and Erickson are hereinafter referred to as the Miller & Schroeder Control Defendants.  Each of these Defendants was a control person of Miller & Schroeder as control is defined by the California Corporations Code.

33.   Together the Miller & Schroeder Corporate Defendants and the Miller & Schroeder control Defendants will be referred-to as the Miller & Schroeder Defendants or Miller & Schroeder.

34.   Plaintiff is informed and believes and based thereon alleges that at all relevant times herein Miller & Schroeder and the Miller & Schroeder Individual Control Defendants completely controlled, dominated, managed, and operated the individual and corporate entities together and intermingled their assets together to suit the convenience of said Defendants, such that the individuality or separateness of said Defendants did not exist but was instead a ruse to avoid liability for their actions and capacities alleged herein.

35.   The acts of each individual and corporate Miller & Schroeder entity were and are the acts of all the Miller & Schroeder Defendants.

**4. Attorney Defendants.**

36.   Plaintiff is informed and believes and based thereon alleges that Defendant Joel T. Boehm is an attorney who resides in San Diego County.  Defendant Boehm and the law firms employing him were retained by Miller & Schroeder to act as underwriter's counsel for the Heritage Bonds.

37.   Plaintiff is informed and believes and based thereon alleges that Defendant Sabo & Green is a dissolved California law firm that employed Defendant Boehm and acted as underwriter's counsel for Miller & Schroeder in connection with the following Heritage Bonds:

- 1996 Rancho Cucamonga;
- 1996 Danforth Texas City;
- 1997 Mexico Beach Sarasota;
- 1997 Danforth Houston;
- 1997 Tarrant Fort Worth;
- 1998 Chicago, 1998 Desert Hot Springs; and
- 1998 Danforth Austin.

38.   Plaintiff is informed and believes and based thereon alleges that Defendant Atkinson, Andelson, Loya, Ruud & Romo is a law firm, located in San Diego County, employing Defendant Boehm and acting as underwriter's counsel for Miller & Schroeder in connection with the following Heritage Bonds:

- 1998 Tarrant Houston;
- 1998 Tarrant Fort Worth;
- 1999 Tarrant Brownsville; and
- 1998 Mexico Beach Seminole.

/ / /

39.  Defendants Boehm, Sabo & Green, and Atkinson, Andelson, Loya, Ruud & Romo are sometimes collectively referred to herein as the "Attorney Defendants."

40.  Augusta and his clients relied on, and were intended beneficiaries entitled to rely on, the opinions, reports, and work product of the Attorney Defendants in connection with the design, creation, due diligence, offering, sale, and operation of the Heritage Bonds.

## 5.  Heritage Entity Defendants.

41.  Plaintiff is informed and believes and based thereon alleges that Defendant Health Care Holdings, LLC ("Health Care Holdings") is a Nevada limited liability corporation (formerly a limited partnership), which purported to provide facility management to some or all of the Heritage Entities, including, but not limited to, Heritage Geriatric IX, Heritage Sarasota, Heritage Chicago, Heritage America, and Heritage Rancho.

42.  Plaintiff is informed and believes and based thereon alleges that Defendant Health Care Holdings, LLC ("HCH") is a Nevada limited liability company dominated and controlled by Defendant Kasirer.  HCH receives fees from bond proceeds to manage the daily operations of the proposed Alzheimer care facilities financed by the Heritage Bonds.

43.  Plaintiff is informed and believes and based thereon alleges that Defendant CareContinuum, LLC  ("CareContinuum"), a California limited liability corporation, purported to provide management of all or some of the Heritage entities' outpatient programs, including but not limited to, Heritage Chicago, Heritage America, and Heritage Rancho.  At all relevant times, Defendant Robert Kasirer was a majority member of CareContinuum and through his majority interest exercised dominion and control over CareContinuum.  Defendant Robert Kasirer controlled this entity.

44.  Plaintiff is informed and believes and based thereon alleges that  Defendant Heritage Housing Development, Inc. ("HHD") is a California not-for-profit public-benefit charitable corporation based in Los Angeles, California.  HHD was organized (in relevant part) for the purpose of operating hospitals, nursing facilities, retirement facilities, assisted living facilities, Alzheimer's facilities and related healthcare facilities.  All of the Heritage

1    Entities are affiliates of HHD.  Defendant Robert Kasirer controlled this entity.

2       45.   On information and belief, Defendant Affiliated Metropolitan Contractors, Inc.

3    ("Affiliated Metropolitan") is a Texas corporation, which received millions of dollars for

4    purported construction services for the various Heritage entities.  Plaintiff is informed and

5    believes that fair consideration was not given in exchange for the substantial sums

6    transferred to Affiliated Metropolitan.

7       46.   On information and belief, Defendant Valuation Counselors Group, Inc.

8    ("Valuation Counselors"), is an Illinois corporation doing business in California.  Valuation

9    Counselors provided market feasibility studies for Defendants Heritage Geriatric IX,

10   Heritage America, Heritage Rancho, Heritage Sarasota, as well as the appraisal for

11   Defendant Heritage Chicago, with the knowledge that its reports would be appended to and

12   incorporated into the official Statement issued in connection with the bond offerings,

13   described below.

14      47.   Plaintiff is informed and believes and based thereon alleges that  Defendant

15   Heritage Housing Development, Inc. is a nonprofit California corporation with headquarters

16   in Encino, California. Defendant Heritage Housing Development, Inc. was and is at all

17   relevant times herein, in the business of using Heritage Bond proceeds to acquire and

18   renovate distressed hospitals.

19      48.   Plaintiff is informed and believes and based thereon alleges that Defendant Heritage

20   Healthcare of America, Inc. is a nonprofit California corporation and an affiliate of

21   Defendant Heritage Housing Development, Inc.

22      49.   Plaintiff is informed and believes and based thereon alleges that Defendant Heritage

23   Rancho Healthcare, Inc. is a nonprofit Nebraska corporation and an affiliate of Defendant

24   Heritage Housing Development, Inc.  Plaintiff is informed and believes that Defendant

25   Heritage Rancho Healthcare Inc. filed bankruptcy in 2000, but is not presently in

26   bankruptcy.

27

28   / / /

50.   Plaintiff is informed and believes and based thereon alleges that Defendant Heritage Care of Chicago, Inc. is a nonprofit Illinois corporation and an affiliate of Defendant Heritage Housing Development, Inc.

51.   Plaintiff is informed and believes and based thereon alleges that Defendant Heritage Geriatric Housing Development IX, Inc. is a nonprofit Texas corporation and an affiliate of Defendant Heritage Housing Development, Inc.

52.   Plaintiff is informed and believes and based thereon alleges that Defendant Heritage Care of Sarasota, Inc. is a nonprofit Florida corporation and an affiliate of Defendant Heritage Housing Development, Inc.

53.   Plaintiff is informed and believes and based thereon alleges that Heritage Housing Development, Inc., Heritage Healthcare of America, Inc., Heritage Rancho Healthcare, Inc., Heritage Care of Chicago, Inc., Heritage Geriatric Housing Development IX, Inc., Heritage Geriatric Housing Development VIII, Inc., Heritage Geriatric Housing Development VII, Inc., Heritage Care of Sarasota, Inc., Jerold Goldstein, Emery Rubin, Larry Rubin, Virgil Lim, Onofrio Bertolini, and Berman & Bertolini, Inc. are sometimes collectively referred to hereinafter as the "Heritage Defendants."

54.   Plaintiff is informed and believes and based thereon alleges that Defendant CareContinuum, LLC is a California limited liability company dominated and controlled by Defendant Kasirer.  CareContinuum, LLC receives a fee from bond proceeds to manage the daily operations of the proposed Alzheimer care facilities financed by the Heritage Bonds.

55.   Plaintiff is informed and believes and based thereon alleges that Defendant BMHC Corp. is a Delaware corporation dominated and controlled by Defendant Kasirer.  BMHC Corp. participates in the acquisition of distressed or vacant hospital properties for resale in connection with the Heritage Bonds.  Heritage Bond proceeds are used to purchase the property.

56.   Robert Kasirer, JDDJ, HHD, HCH, CareContinuum, LLC, and BMHC Corp., are sometimes collectively referred to hereinafter as the "Kasirer Defendants."

/ / /

## 6. U.S. Trust Entity Defendants.

57.   Plaintiff is informed and believes and based thereon alleges that Defendant U.S. Trust Company of Texas, N.A. is a banking association with its principal place of business in Dallas, Texas, and is a wholly owned subsidiary of Defendant U.S. Trust Corporation, N.A.  U.S. Trust is and was at all relevant times herein acting as the trustee, pursuant to either an Indenture of Trust and Security Agreement or a Master Indenture of Trust and Security Agreement (collectively, the "Indentures"), for all of the Heritage Bonds except the 1996 Rancho Cucamonga offering.  Plaintiff is informed and believes that Defendant U.S. Trust is a banking association with its principal place of business located in Dallas, Texas.

58.   Plaintiff is informed and believes and based thereon alleges that Defendant U.S. Trust Corporation, N.A. is a national banking association with its principal place of business in New York, New York.  U.S. Trust Corporation is a for-profit business that markets itself to the investing public as providing trust services nation-wide and having expertise, among other things, in government bonds and bond projects.  On information and belief, U.S. Trust Corporation controls and dominates the business affairs and operation of U.S. Trust Company of Texas, such that no separateness exists between them.  U.S. Trust Corporation, N.A. and U.S. Trust Company of Texas are jointly referenced as "U.S. Trust."

59.   Plaintiff is informed and believes and based thereon alleges that in approximately June of 2001, Defendant U.S. Trust sold its trust service business to Defendant The Bank of New York, Inc. ("BONY"), who became the successor trustee for the Heritage Bonds.  Plaintiff is informed and believes that Defendant BONY is a New York corporation headquartered in New York, New York, and doing business throughout the United States.  Pursuant to its acquisition of Defendant U.S. Trust, Defendant BONY assumed the responsibilities to act as Bond Trustee under the indentures, Loan Agreements, and Trust Deeds and Mortgages in or about November 2001.  Defendant BONY is the successor to Defendant U.S. Trust and assumed Defendant U.S. Trust's liabilities in connection with its action and inaction as Trustee.  In connection with their responsibilities pursuant to the

1   Indentures, Loan Agreement, and the Trust Deed and Mortgages, Defendant U.S. Trust and

2   BONY owed a fiduciary duty to Augusta and all other purchasers of Heritage Bonds.

3

4   **7. Individual Heritage Defendants.**

5        60.   Plaintiff is informed and believes and based thereon alleges that Defendant Robert

6   A. Kasirer is a resident of Los Angeles County.  Defendant Kasirer is in the business of

7   buying, selling, and renovating distressed or vacant health care properties with funds raised

8   from the public sale of municipal bonds.  Defendant Kasirer conducts business as an owner,

9   officer, director, and control person of co-Defendants JDDJ Holdings, L.P., Health Care

10  Holdings, LLC, CareContinuum, LLC, and BHMC Corp., and is the alter ego of each of

11  these entities.  There is such a unity of interests and ownership between Defendants JDDJ

12  Holdings, L.P., Health Care Holdings, LLC, CareContinuum, LLC, BHMC Corp., and

13  Kasirer that any individuality and separateness between these Defendants has ceased to exist

14  as Defendant Kasirer has controlled, dominated, managed and operated these Defendants

15  and received funds therefrom to suit Defendant Kasirer's convenience and has utilized these

16  Defendants as artifices in the scheme to defraud, and the facts are such that if the acts of

17  these Defendants are treated as the acts of the Defendants alone, an inequitable result will

18  follow.  Defendant Kasirer was also a control person of Defendants Heritage Housing

19  Development, Inc., Heritage Healthcare of America, Inc., Heritage Rancho Healthcare, Inc.,

20  Heritage Care of Chicago, Inc., Heritage Geriatric Housing Development IX, Inc., Heritage

21  Geriatric Development VIII, Inc., Heritage Geriatric Housing Development VII, Inc., and

22  Heritage Care of Sarasota, Inc., pursuant to the Agreement to Expand Management Services

23  and the practice of the Heritage Defendants in permitting Defendant Kasirer to direct and

24  control their businesses.

25       61.   Plaintiff is informed and believes and based thereon alleges that Defendant Debra

26  Kasirer, wife of Robert Kasirer resides in Beverly Hills, California.  Debra Kasirer is the

27  trustee of Defendant Debra Kasirer Trust and one of the owners of Defendant Canon Realty

28  Corporation, a Delaware corporation doing business in California.  Debra Kasirer is also

1   Manager and member of Defendant Kasirer Family Holdings #4, LLC, a California Limited

2   Liability Company in which Defendant Robert Kasirer is also a member.  Debra Dasirer, as

3   Trustee for the Debra Kasirer Trust, Kasirer Family Holdings #4, LLC, and Canon Realty

4   Corporation are sued separately to avoid a fraudulent conveyance of real or personal

5   property, which plaintiff is informed and believes are community property assets of Robert

6   Kasirer.  Plaintiff is informed and believes that Defendant Robert and Debra Kasirer have

7   fraudulently conveyed assets to these entities, assets that may include or be traceable to ill-

8   gotten proceeds from the bond offerings.

9       62.   Plaintiff is informed and believes and based thereon alleges that Defendant Jerold

10  V. Goldstein is and at all relevant times herein was a licensed California attorney acting as

11  an officer and director for Heritage Housing Development, Inc. and its affiliates.  Plaintiff

12  is informed and believes that Defendant Goldstein resides in Los Angeles County.

13  Defendant Goldstein was the President and principal executive officer of Defendant

14  Heritage Healthcare of America, Inc., and executed Official Statements for three of the

15  Heritage Bond offerings which are the subject of this action.

16      63.   Plaintiff is informed and believes and based thereon alleges that Defendant Emery

17  Rubin is and at all relevant times herein was acting as an officer and director of Heritage

18  Housing Development, Inc., and its affiliates.  Plaintiff is informed and believes that

19  Defendant Emery Rubin resided in Los Angeles County but is now deceased.

20      64.   Plaintiff is informed and believes and based thereon alleges that Defendant Larry

21  A. Rubin is and at all relevant times herein was acting as an officer and director for Heritage

22  Housing Development, Inc., and its affiliates.  Plaintiff is informed and believes that

23  Defendant Larry Rubin is the son of Emery Rubin and a resident of Los Angeles County.

24      65.   Plaintiff is informed and believes and based thereon alleges that Defendant Virgil

25  Lim is and at all relevant times herein was acting as an officer and director for Heritage

26  Housing Development, Inc., and its affiliates.  Plaintiff is informed and believes that

27  Defendant Lim resides in Los Angeles County.

28      66.   Plaintiff is informed and believes and based thereon alleges that Defendant Onofrio

1    Bertolini is and at all relevant times herein was acting as an officer and director for Heritage

2    Housing Development, Inc., and its affiliates.  Defendant Bertolini is also a principal of

3    Defendant Berman and Bertolini, Inc.  Plaintiff is informed and believes that Defendant

4    Bertolini resides in Los Angeles County.  Defendant Bertolini executed Official Statements

5    for nine (9) of the Heritage Bond offerings.

6        67.   Plaintiff is informed and believes and based thereon alleges that Defendant Berman

7    & Bertolini, Inc., aka Berman & Associates is a California corporation with offices in Los

8    Angeles County engaged in construction oversight in connection with the Heritage Bonds.

9        68.   Plaintiff is informed and believes and based thereon alleges that Defendant Leo

10   Dierckman, is a resident of Indiana, as was an affiliate of the Kasirer Defendants and the

11   Heritage Defendants.  On information and belief, he was charged with giving tours of the

12   properties and was intimately involved in the underwriting process, including preparation

13   of the Official Statements, undertaken by Miller & Schroeder, as a representative of these

14   other Defendants to provide information, and is thus in part responsible for the contents of

15   the Official Statements.

16

17   **8.  Kasirer Entity Defendants.**

18       69.   Plaintiff is informed and believes and based thereon alleges that Defendant BHMC

19   Corp. is a Delaware corporation dominated and controlled by Defendant Kasirer.  BHMC

20   Corp. participated in the acquisition of distressed or vacant hospital properties for resale in

21   connection with the Heritage Bonds.  Heritage Bond proceeds were used to purchase the

22   property.

23       70.   Plaintiff is informed and believes and based thereon alleges that Defendant JDDJ

24   Holdings, L.P. ("JDDJ") is a California limited partnership dominated and controlled by

25   Defendant Kasirer.  JDDJ participates in the acquisition of distressed hospital properties for

26   resale in connection with the Heritage Bond underwritings complained of herein.  Heritage

27   Bond proceeds are used to purchase the property.

28       71.   Defendants and each of them, unless otherwise stated in this Complaint, directly

or indirectly, singularly and in concert. and aiding and abetting each other, have engaged in acts and practices constituting violations of law complained of herein pursuant to a common plan and scheme among all Defendants.

72.   Plaintiff is ignorant of the true names and capacities of Defendants sued herein as DOES, and therefore sue these Defendants by such fictitious names.  Plaintiff will amend this complaint to allege the true names and capacities of said DOES, when such information is ascertained by plaintiff.

73.   At all times relevant herein, Defendants, and each of them, acted as an agent of each other Defendants in connection with the acts and omissions alleged herein.  Plaintiff is informed and believes and based upon such information and belief alleges that the fictitiously named Defendants, and each of them, materially assisted in the implementation of the acts and omissions which proximately caused the injuries and damages alleged herein.

74.   Certain of the DOE Defendants, whose identities are currently unknown to Plaintiff, acted as the joint venturers, general partners, co-conspirators, principals, agents, employees, officers, attorneys, accountants, or advisors to the named Defendants herein, and at such time were on notice of facts sufficient to suggest the existence of the improprieties alleged herein to a reasonable and prudent person of the same profession, yet said Defendants assisted the named Defendants either intentionally or negligently, or acted in a legally culpable manner or capacity so as to be jointly and severally liable herein, all as will be alleged with more specificity after discovery in this case.

# Jurisdiction and Venue

75.   This Court has jurisdiction pursuant to 28 U.S.C. Section 1334; general order 312-D of the United States District Court Southern District of California; and 28 U.S.C. Section 157(b)(2)(A), (E), (H) and (O).  Venue is proper in this district according to 28 U.S.C. Section 1409 because the underlined bankruptcy case is presiding in this district.

/ / /

5189-10/202291.3

19

1    / / /

2    # General Allegations

3    76.   Debtor Mark F. Augusta was formerly a registered representative of Miller &

4    Schroeder working out of its Solana Beach, California office.  As part of his duly authorized

5    duties at Miller & Schroeder, Augusta sold certain municipal bonds to his clients.  The

6    municipal bonds were structured as conduit financing for the acquisition of distressed

7    hospital properties.  The stated issuer of the municipal bonds was either a municipality or

8    municipal agency that assumed no debt obligations to bond holders and no project oversight.

9    Instead, bond holders were dependent upon the integrity and skill of the promoter,

10   Defendant Heritage Housing Development, Inc. and its affiliates, and the manager,

11   Defendant Robert Kasirer and his affiliates, to generate operating revenues from the

12   proposed health care facilities to pay debt obligations of principal and interest to the

13   bondholders.  Twelve related bond offerings with a face value of over $144 million, were

14   financed, structured, and marketed by Miller & Schroeder from its Solana Beach, California

15   office.  Almost all of the bonds are in default and are hereinafter referred to as the "Heritage

16   Bonds."

17   77.   As a result of the failure of the Heritage Bond offerings sold by Augusta, under the

18   direction and guidance of his employers, Augusta was named as a respondent in a number

19   of arbitration claims filed by his former clients, seeking damages against Augusta.  These

20   claims accused Augusta of intentionally defrauding his clients as to the risks associated with

21   the municipal bonds.  These claims alleged that Augusta's clients decided to purchase the

22   investments based upon false information provided by Augusta to the clients.  Without

23   admitting any liability or wrongdoing in the matter, plaintiff asserts that all of the

24   information that Augusta provided his clients was obtained from his employers at Miller &

25   Schroeder and from the other Defendants in this action, who were the corporate insiders of

26   the investment sponsors, the underwriters of the investments, the accountants for the

27   investment sponsors, and the attorneys for the investment sponsors, all of whom were in

28   such a position as to have far superior knowledge about the true facts than Augusta, who

1  was in fact merely a sales representative for Miller & Schroeder.

2  78.   For his part, Augusta reasonably believed that the Heritage Bonds constituted a

3  legitimate investment, and Augusta was blamelessly innocent of the fact that the information

4  that had been provided by the Defendants regarding the Heritage Bonds was false and

5  misleading.

6  79.   Defendants in this action are those persons and entities who either provided false

7  information to Augusta, or were involved in the sponsorship of the subject investments.  The

8  basis of this action is that the Defendants engaged in a massive fraud in connection with the

9  Heritage Bonds, the effect of which was to mislead Augusta and Augusta's clients.  As a

10  result, Augusta's clients have suffered substantial investment losses, and Augusta has been

11  held liable by arbitration panels for not less than $1 million.  Further, Augusta's reputation

12  has been damaged, as has Augusta's earning capacity, all in an amount according to proof.

13  Augusta and Augusta's wife were forced to file bankruptcy as a result of the fraud and

14  misconduct of the Defendants.  Augusta has suffered extreme emotional distress as a result

15  of the Heritage Bond fiasco, all to his damage in an amount according to proof.

16

17  **1.  History of the Heritage Bond Offerings.**

18  80.   Investment bankers and attorneys for Miller & Schroeder structured each of the

19  Heritage Bond offerings during negotiations with Defendants Kasirer and Heritage Housing

20  Development, Inc. and their affiliates.  The creation and marketing of the Heritage Bonds

21  were centered in the Solana Beach office of Miller & Schroeder.  The Heritage Bonds were

22  offered and sold primarily from the Solana Beach branch office of Miller & Schroeder

23  which acted as the underwriter for each of the Heritage Bonds.

24  81.   With respect to each of the Heritage Bonds, a primary disclosure document known

25  as The Official Statement was prepared by Miller & Schroeder's counsel, Defendant Joel

26  Boehm.   Defendants knew these Official Statements contained common and typical

27  misrepresentations of material fact and omitted to state other facts necessary to be disclosed

28  so that other facts stated would not be misleading.  Generally, the misrepresentations and

omissions concerned: (1) overstating the value of collateral represented by the underlying real estate projects securing the Heritage Bonds; (2) the background and experience of the Heritage Bond promoters and managers; (3) an undisclosed financial relationship between the Heritage Bond promoters and Miller & Schroeder in the form of undisclosed loans from Miller & Schroeder, and their repayment from bond proceeds; (4) a course of business to conceal development delays and cost overruns that were extraordinary in light of promised construction cost "guarantees" and performance bonds described in the Official Statements, for Heritage Bond offerings structured, financed, and marketed by Miller &.Schroeder; and a practice of diverting bond proceeds from real estate projects for which the bonds were sold to Defendants' own uses and to other real estate projects to create the impression that the Heritage Bond promoters were successful promoters, developers and operators of health care facilities when in fact the entire operation was in the nature of a Ponzi scheme whereby new bond offerings were being conducted to finance projects other than the project identified in the Official Statements.

82.    These misrepresentations and omissions of material facts were contained in written Official Statements (including Preliminary Official Statements) drafted by Defendant Joel Boehm.  The Official Statements were drafted for the purpose of dissemination to (i) the sales staff employed by Defendant Miller & Schroeder, including brokers employed in its Solana Beach, California office, and (ii) to offerees and purchasers of Heritage Bonds, as required by law.  The Official Statements were prepared and the misrepresentations were made for the purpose of inducing reliance upon them by prospective purchasers of the Heritage Bonds and the sales force employed to sell the Heritage Bonds.    The misrepresentations caused the bonds to be in a state of default and the losses suffered by Augusta's clients and directly resulted in the filing of the arbitration claims against Augusta.

83.    Augusta, for his part, was blamelessly ignorant of the falsehoods contained in the Official Statements.

84.    Each of the Heritage Bonds was issued pursuant to an Indenture and Security Agreement.  The Heritage Bond offering proceeds were transmitted to the trustee of the

1   Indenture and Security Agreement, who maintained accounts in trust for the express benefit

2   of Augusta and all those similarly situated to whom the trustee owed fiduciary duties.  The

3   Indenture and Security Agreement permitted the trustee to loan funds held in trust to the

4   Heritage private issuer to purchase the project property, and thereafter only for expenses

5   incurred in connection with that particular project pursuant to a Loan Agreement.

6       85.   The trustee of the Indenture and Security Agreement also acted as trustee with

7   respect to first trust deeds and mortgages and is generally referred to as the Bond Trustee.

8   Defendant U.S. Trust Company of Texas acted as the Bond Trustee for the benefit of the

9   purchasers of the bonds, including Augusta and all those similarly situated.

10      86.   Defendant U.S. Trust Company of Texas breached its fiduciary duties as Bond

11  Trustee by (i) permitting the withdrawal of funds held in trust pursuant to improper

12  disbursement requests which did not comply with the Indenture Agreement; (ii) continuing

13  to disburse funds despite a lack of compliance with financial reporting and certification

14  requirements of the Indenture and Loan Agreements; and (iii) failing to adequately represent

15  the interests of bondholders after advising bondholders that Defendant U.S. Trust was

16  investigating wrongdoing of the Heritage entities.

17      87.   At all relevant times herein the Miller & Schroeder Corporate Defendants were

18  inadequately capitalized and had no genuine or separate existence, but were and are used

19  and are existing for the sole purpose of permitting all the Miller & Schroeder Defendants

20  to transact a portion or portions of their business under separate guises.

21      88.   The Miller & Schroeder Defendants manipulated the financial books and records

22  of separate subsidiaries Miller & Schroeder Investments (MSI) and Miller & Schroeder

23  Financial (MSF), to make it appear as though MSF met the SEC-mandated Net Capital

24  Requirements for brokerage firms when in fact it would not have met those requirements

25  and hence would not have been allowed to act as underwriters for the subject municipal

26  bonds and/or others.  The Miller & Schroeder Defendants simply transferred certain cash

27  assets (i.e. the "float" on payments from MSI's loan participations) of MSI back-and-forth

28  between the books of MSI and MSF when convenient or necessary in order to boost MSF's

1    appearance of adequate net capital to make the Heritage.  Bonds and other bonds

2    underwritings.  This also had the effect of deceiving Augusta, other employees, and the

3    firms' customers as to the capital base and financial strength of the company.

4    89.  When the Miller & Schroeder Defendants sold MSF's assets, such sale was not an

5    "arm's length" sale but was instead a ruse which enabled them to use the proceeds from that

6    sale ($1,000,000) not to pay liabilities to investors or indemnify their brokers as they'd

7    promised.  Instead, they gave that money to Defendant Sexton purportedly to repay part of

8    a $4.5 million dollar loan he had made to the companies, along with a note for $3.5 million.

9    That "note" should have been subordinate to Defendants obligations to Augusta and his

10    clients.  Sexton promptly "reloaned" that money to the sham successor entities, Defendants

11    herein.  In this fashion and others the Miller & Schroeder Defendants looted Miller &

12    Schroeder and retained all their assets, while attempting to avoid their liabilities.  This

13    transfer of funds and others was a fraudulent conveyance, made as it was in the face of

14    pending liability to investors and Augusta.

15    90.  Failure to pierce the corporate veil(s) would promote injustice and, based thereon,

16    the Miller & Schroeder Defendants are jointly and severally liable.

17    91.  All Miller & Schroeder entities were Augusta's employer, were owned and

18    operated as one entity, and were in the business of preparing bond products for Augusta to

19    sell to his clients.   All Miller & Schroeder entities had a duty to perform proper due

20    diligence and to provide only legitimate, well researched, suitable and fully disclosed bond

21    offerings for sale by Augusta to his clients.  In addition, the Miller & Schroeder entities had

22    duties under Labor Code Section 2802 to indemnify and defend and hold harmless Augusta

23    from all liability, expenditures and losses on account of the Heritage bonds.  Miller &

24    Schroeder, Inc. is not named as a Defendant due to the fact that it filed for Chapter 7

25    Bankruptcy relief in Minnesota in January 2002 and the automatic stay pursuant to

26    11 U.S.C. § 362.

27    92.  By letters dated from September 7, 1999, through at least April 2001, Defendant

28    U.S. Trust Company of Texas represented to Augusta's clients that Defendant U.S. Trust

Company of Texas was investigating claims of "Questioned Transfers" of funds by the Heritage affiliates and would take all appropriate actions in the best interests of bondholders including the litigation of actions against those responsible for bondholder losses to be funded with trust funds held for the benefit of the bondholders.

93.    Defendant U.S. Trust Company of Texas fraudulently concealed from Augusta and Augusta's clients the factual basis for the claims asserted herein.  The concealment occurred in an attempt to obtain the cooperation of Miller & Schroeder and the Heritage affiliates to work jointly to limit bondholder litigation and thus limit the exposure of Defendant U.S. Trust Company of Texas for its responsibility for bondholder losses.  Indeed, Defendant U.S. Trust Company of Texas entered into a settlement agreement with certain Defendants dated June 8, 2000, which purports to compromise bondholder claims.  The settlement agreement contains covenants between Defendant U.S. Trust Company of Texas and certain Defendants not to institute or aid in the litigation of bondholder claims.  These terms were fraudulently concealed from Augusta and Augusta's clients who were informed that "Heritage" was cooperating with the Bond Trustee in connection with the appointments of receivers and foreclosure proceedings.

94.    As a result of Defendant U.S. Trust Company of Texas's communications to bondholders to whom it owed a fiduciary duty, Augusta and Augusta's clients were lulled into inaction and the facts were fraudulently concealed from them.  Augusta and Augusta's clients were generally unaware of findings issued by an accounting firm in July and August 1999 to Miller & Schroeder and U.S. Trust Company of Texas with respect to the diversion of millions of dollars of bond proceeds, including the personal use of bond proceeds by Defendant Kasirer and his affiliates use of bond proceeds for Hawaiian and Las Vegas vacations, amongst other inappropriate expenditures.

## 2. Chronology of the Heritage Bonds.

95.    Beginning in 1996, Miller & Schroeder financed, structured, offered, and sold the Heritage Bonds described as follows:

1. **Municipal Issuer:** California Communities Local Public Improvements Financing **Authority**
   **Private Issuer:** Heritage Rancho Healthcare, Inc.
   **Project Name:** Heritage Hospital ("1996 Rancho Cucamonga" )
   **Location:** Rancho Cucamonga, California
   **Amount:** $13,050,000
   **Official Statement Date:** February 15, 1996

2. **Municipal Issuer:**   Danforth Health Facilities Corporation
   **Private Issuer:**   Heritage Geriatric Housing Development VII, Inc.
   **Project Name:** Danforth Gardens ("1996 Danforth - Texas City")
   **Location:** Texas City, Texas
   **Amount:** $7,295,000
   **Official Statement Date:** December 20, 1996

3. **Municipal Issuer:** Danforth Health Facilities Corporation
   **Private Issuer:** Heritage Geriatric Housing Development VIII, Inc.
   **Project Name:** Sam Houston Gardens ("1997 Danforth– Houston")
   **Location:** Houston, Texas
   **Amount:** $10,370,000
   **Official Statement Date:** March 3, 1997

4. **Municipal Issuer:** Tarrant County Health Facilities Development Corporation
   **Private Issuer:** Heritage Geriatric Housing Development IX, Inc.
   **Project Name:** St. Joseph Gardens ("1997 Tarrant – Fort Worth")
   **Location:** Fort Worth, TX
   **Amount:** $13,420,000
   **Official Statement Date:** May 15, 1997

5. **Municipal Issuer:** City of Mexico Beach, Florida
   **Private Issuer:** Heritage Care of Sarasota, Inc.
   **Project Name:** Heritage house of Sarasota ("1997 Mexico Beach – Sarasota")
   **Location:** Sarasota, Florida
   **Amount:** $12,305,000
   **Official Statement Date:** December 22, 1997

6. **Municipal Issuer:** Danforth Health Facilities Corporation
   **Private Issuer:** Heritage Healthcare of America
   **Project Name:** Duval Gardens ("1998 Danforth – Austin")
   **Location:** Austin, Texas
   **Amount:** $11,090,000
   **Official Statement Date:** July 10, 1998

7. **Municipal Issuer:** City of Chicago, Illinois
   **Private Issuer:** Heritage Care of Chicago, Inc.
   **Project Name:** Heritage House of Chicago ("1998 Chicago")
   **Location:** Chicago, Illinois
   **Amount:** $17,275,000
   **Official Statement Date:** July 24, 1998

8. **Municipal Issuer:** Desert Hot Springs Public Financing Authority
   **Private Issuer:** Heritage Rancho Healthcare, Inc.
   **Project Name:** Heritage Hospital ("1998 Desert Hot Springs")
   **Location:** Rancho Cucamonga, California
   **Amount:** $22,330,000

**Official Statement Date:** August 20, 1998

/ / /

9.  **Municipal Issuer:** Tarrant County Health Facilities Development Corporation
    **Private Issuer:** Heritage Geriatric Housing Development IX, Inc.
    **Project Name:** St. Joseph Gardens ("1998 Tarrant - Fort Worth")
    **Location:** Fort Worth, TX
    **Amount:** $6,855,000
    **Official Statement Date:** October 5, 1998

10. **Municipal Issuer:** Tarrant County Health Facilities Development Corporation
    **Private Issuer:** Heritage Healthcare of America, Inc.
    **Project Name:** Eastwood Gardens ("1998 Tarrant - East Houston")
    **Location:** East Houston, Texas
    **Amount:** $11,320,000
    **Official Statement Date:** November 13, 1998

11. **Municipal Issuer:** City of Mexico Beach, Florida
    **Private Issuer:** Heritage Healthcare of America, Inc.
    **Project Name:** Heritage House of Seminole ("1998 Mexico Beach - Seminole)
    **Location:** Seminole, Florida
    **Amount:** $7,230,000
    **Official Statement Date:** December 21, 1998

12. **Municipal Issuer:** Tarrant County Health Facilities Development Corporation
    **Private Issuer:** Heritage Healthcare of America, Inc.
    **Project Name:** Valley Gardens
    **Location:** Brownsville, Texas (" 1999 Tarrant - Brownsville" )
    **Amount:** $11,735,000
    **Official Statement Date:** March 11, 1999

96.   Commencing in or about 1995, Defendants entered into an agreement and scheme to defraud investors by offering and selling Heritage Bonds through the use of false and misleading statements of material fact in Official Statements (wherever this First Amended Complaint refers to Official Statements it also includes Preliminary Official Statements unless stated otherwise).  The Official Statements were to be utilized to offer and sell municipal bonds in which bond proceeds would be diverted from the stated purpose of the bond offerings to other projects and for the Defendants' own purposes.

97.   The idea for the scheme to defraud was first developed by Defendant Kasirer who had been a developer and/or manager of troubled elder care facilities pursuant to municipal bond offerings.  Defendant Kasirer, either directly or through one of several corporations he controlled, was in a business dispute with HCA Columbia Healthcare Corporation (HCA Columbia), a large public company which had acquired a number of hospitals throughout

various states as a result of its merger and acquisition business strategy. This strategy called for selling certain unwanted hospitals, particularly older facilities which were in poor condition. The scheme to defraud contemplated the offer and sale of municipal bonds to finance the acquisition of a hospital in Rancho Cucamonga, California which was mostly built but had not opened, to finance the acquisition of HCA Columbia hospitals which were to be converted to Alzheimer care facilities.

98. Defendant Kasirer planned to purchase the hospitals at a deep discount, resell them at a substantial profit to a new owner funded by a municipal bond offering, without disclosing the terms of Defendant Kasirer's purchase nor the amount of profit Defendant Kasirer would receive nor that the hospitals were burdened by restrictive covenants which prohibited that they be utilized as medical facilities. Defendant Kasirer further planned to illegally profit from this scheme by establishing himself, or one of his closely controlled companies, as the manager of the Rancho Cucamonga Hospital and the various HCA Columbia hospitals to be converted to Alzheimer care facilities and pursuant to management agreements, gain access to the proceeds of the bond offerings and convert a portion of the same to his own uses. Thus, Defendant Robert Kasirer's scheme called for the obtaining of an undisclosed profit in connection with the acquisition of the Rancho Cucamonga Hospital and the HCA Columbia hospitals with municipal bond proceeds, and receipt of management fees and illegally diverted offering proceeds and revenues as the facility "manager."

99. Amongst the reasons Defendant Kasirer was driven to develop the scheme to defraud included business failures which resulted in substantial debts and liabilities including judgments and liens against Defendant Kasirer and his entities during the time period that the scheme to defraud alleged herein was developed.

100. Defendant Robert Kasirer took his above-described plan to profit from the acquisition of the Rancho Cucamonga Hospital and the financing and operation of HCA Columbia hospitals, to Defendants Emery Rubin and his son, Larry Rubin, Jerold Goldstein, and Heritage Housing Development, Inc. and requested that they agree to act as private issuers of municipal securities to finance the scheme. Defendants Emery Rubin, Larry

Rubin, Jerold Goldstein and Heritage Housing Development, Inc. were aware of Defendant Kasirer's failures in the management of elder care facilities as Defendant Emery Rubin had been a principal in municipal securities offerings for elder care facilities funded by municipal security offerings along with Defendant Kasirer.  Defendant Emery Rubin was also a Defendant, and Jerold Goldstein represented a Defendant, in a civil action entitled *National Fire Insurance Company of Hartford, et al v Robert A Kasirer, et al*, District Court, El Paso County, State of Colorado, Case No. 93 CV 1319 filed June 23,1993, in which a group of investors including insurance companies whose investments exceeded $20 million in municipal bonds alleged that Defendant Kasirer had committed a fraud through an official statement utilized to offer and sell municipal bonds in which the official statement made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made in light of the circumstances under which they were made, not misleading.  The complaint further alleged a breach of fiduciary duty by Defendant Kasirer and fraud resulting from the defeasance of bonds held by Defendant Kasirer at substantial profit which were represented in the Official Statement as a subordinate interest to the Augusta bond holders.  The complaint by National Union Fire Insurance Company further alleged that entities owned by Defendant Kasirer and under his control breached agreements and representations in the official statement with respect to Guaranty Agreements signed by Defendant Kasirer for timely completion of construction. The complaint by National Union Fire Insurance Company further alleged that Defendant Kasirer took improper draws of monies and disbursements from bond proceeds and caused (or allowed) substantial cost overruns.  Plaintiff is informed and believes that the allegations in the complaint by National Fire Insurance Company of Hartford against Defendant Kasirer, et. al. are true and correct and were known by Defendants Kasirer, Emery Rubin, Larry Rubin, and Jerold Goldstein to be correct.

101. Defendants Kasirer, Emery Rubin, Larry Rubin and/or Heritage Housing Development, Inc. decided to recruit a broker-dealer to act as the investment banker and seller of the municipal bonds contemplated by the scheme to defraud.  Defendants James

Iverson and Miller & Schroeder who were longtime participants in the municipal securities industry, agreed to join the conspiracy to defraud and were recruited to act as the investment banker and selling broker-dealer.  Defendants Joel Boehm and Sabo & Green joined the conspiracy to defraud as counsel to Miller & Schroeder for the offerings contemplated by the scheme to defraud and drafters of the Official Statements to be utilized in connection with the offer and sale of the municipal bonds to the public.  Defendant Victor Dhooge who worked as an investment banker under the supervision of Defendant James Iverson, was directed to act as investment banker for the offerings contemplated by the scheme to defraud.

102. As longtime participants in the municipal securities and healthcare financing fields of the securities industries, Defendants James Iverson and Miller & Schroeder were aware of the failures of Defendant Kasirer and allegations of wrong doing which had been made against Defendant Kasirer.  Defendants Iverson and Boehm interviewed Defendant Kasirer prior to the first offering contemplated by the scheme to defraud with respect to the allegations of wrong doing which had been made against Defendant Kasirer, including those made within the lawsuit filed by National Fire Insurance Company of Hartford, et al.

103. Plaintiff is informed and believes that Defendant Boehm also became aware of the judgments and liens and writ of attachments as Defendant Boehm was asked by Defendant Dhooge to conduct a litigation search with respect to Defendant Robert Kasirer.  Plaintiff is also informed and believes and based thereon alleges that Defendant Boehm had a discussion with Defendant Kasirer with respect to his litigation history and Defendant Kasirer told Defendant Boehm of the judgments and liabilities facing Defendant Kasirer. Despite the substantial negative information concerning Defendant Kasirer and his qualifications to act as a manager of a healthcare facility funded by a municipal bond offering, Defendants determined to conceal this negative information as one aspect of the scheme to defraud and create the fraudulent impression that Defendant Kasirer had a successful track record.

104. Pursuant to the agreement and scheme to defraud, Miller & Schroeder acted as the

investment banker and lead underwriter in all twelve Heritage Bond offerings. Under the direction of Miller & Schroeder control Defendants, and others unknown to Augusta at this time, Miller & Schroeder raised capital for purported health care facility development by structuring securities offerings utilizing a municipal entity as the stated issuer.  Miller & Schroeder offered and sold the municipal bonds through its retail brokers.

105. Pursuant to the scheme to defraud investors, Defendants determined to organize and sell a series of related municipal bond offerings with certain common characteristics.  Amongst the common characteristics were the following:

1.  The municipal bond securities would be offered and sold through Official Statements distributed to offerees as required by law which would act as the disclosure statement that Defendants intended offerees and subscribers to rely upon in connection with their investment decision.

2.  The Official Statements would contain untrue statements of material facts concerning the security for the bonds, the background and experience of the bond promoters and managers, and an undisclosed financial relationship between the bond promoters and managers, on the one hand, and Miller & Schroeder which provided the seed capital in the form of loans to the Kasirer Defendants and the Heritage Defendants to fund the pre-offering activities such as obtaining appraisals and other costs associated with the formation of individual offerings.

3.  For each offering a municipality or municipal agency would be recruited to act as the nominal issuer.  However the nominal issuer would have no stated liability for payments on the bonds.  The municipalities would be persuaded to act as a nominal issuer based upon assurances from the Defendant that they would have no responsibility for the repayment of the bonds nor the preparation of offering documents, including the Official Statements for use in the sale of the bonds which would be prepared by Defendant.  The Defendant agreed amongst themselves that the Official Statements would be prepared by counsel retained by the underwriter, Miller & Schroeder.

4.   Pursuant to Securities and Exchange Commission Rule 131 the bonds would be structured as "conduit financing" whereby the bond payments would not be an obligation of a municipality of municipal agency and the bond proceeds would be received by a private entity which would also be considered an "issuer" pursuant to Rule 131.  The private issuer would be either Heritage Housing Development Inc. or a subsidiary to be established for the purpose of conducting the offering and receiving bond proceeds and owning and operating the facility being financed.

5.   The private issuer (a Heritage Defendant referred to in the Official Statement as "The Company") would be the owner of the health care facility after purchasing the hospital or former hospital with municipal bond proceeds from an entity owned and controlled by Defendant Kasirer who would receive an undisclosed profit in connection with the sale of the former hospital.

6.   For each of the offerings contemplated by the scheme to defraud, a corporation controlled by Defendant Kasirer would act as project manager under contract from the owner and private issuer and would control, along with the Heritage Defendants, the expenditure of bond proceeds and construction and renovation of the projects.

7.   For each of the offerings contemplated by the scheme to defraud, a Bond Trustee would act pursuant to an indenture agreement as trustee responsible for the disbursement of bond proceeds to the private issuer and owner of the facility pursuant to a loan agreement and as trustee in connection with a first deed of trust securing bond payments.

8.   Investors in the bonds contemplated by the scheme to defraud would be provided assurances that the structure of the investment and offering would provide adequate security for the repayment of the bonds.  Amongst the reassuring features to be described in the Official Statements were:

(1)   the presence of a fiduciary Bond Trustee to disburse bond proceeds only for purposes stated in the Official Statements;

(2)   security for the payment on the bonds pursuant to (i) a loan agreement with

the private issuer/owner; (ii) a first deed of trust on the real estate with covenants for (a) debt service coverage ratio; (b) days cash hand, trade payable and occupancy levels covenants to be certified on a quarterly basis; (iii) a first priority security interest in the personal property and revenues; (iv) a security interest in the project fund in favor of the bond holders to be held by the Bond Trustee;

(3)    a debt service reserve fund to be established with the Bond Trustee;

(4)    a renewal and replacement fund with the Bond Trustee;

(5)    a bond fund and operating reserve fund for working capital purposes to be deposited with the Bond Trustee;

(6)    a subordination agreement between the owner/private issuer and the facility manager (an affiliate of Defendant Kasirer) with respect to management fees;

(7)    an operating deficits agreement whereby the facility manager (an affiliate of Defendant Kasirer) would be obligated to make up operating deficits up to a determined amount;

(8)    a feasibility study supporting the ability of the private issuer to generate positive cash flow to fund payments to bondholders when they were to come due;

(9)    a real estate appraisal providing reason to believe that there was adequate security which appraisal was provided on an "as is" basis and after renovation to provide adequate security for repayment of the bonds; and

(10)  construction contract guarantees with fixed prices, completion deadlines, and performance bonds.

9.  Each of the offerings of municipal bonds would be conducted as a "firm commitment" underwriting whereby Miller & Schroeder would purchase 100% of the bonds being offered and resell them to their clients at par.  Miller & Schroeder would receive an underwriter's discount.  The private issuer/owner was required pursuant to the terms of the indenture and first deed of trust and loan agreement to provide certain financial reports and certifications on a quarterly and annual basis to the bond trustee.

106. In furtherance of the scheme to defraud, the Defendants published an Official Statement dated February 15,1996 which was drafted by Defendants Boehm and Sabo & Green in connection with the offer and sale of $12,030,000 in series "A"tax exempt bonds and $1,020,000 series `B" bonds issued by California Communities local Public Improvements Financing Authority to be loaned to the private issuer/owner Defendant Heritage Rancho Healthcare, Inc., a subsidiary of Defendant Heritage Housing Development, Inc. This municipal bond offering was for the purported purpose of financing the acquisition, renovation, equipping, tenant improvements, and working capital for the Rancho Cucamonga Hospital and Medical Center in Ranch Cucamonga, California, aka Heritage Hospital.

107. During 1996 the Rancho Cucamonga Hospital refurbishment was behind schedule and cost overruns were incurred. In order to try and make ends meet, Defendant Heritage Rancho Healthcare Inc. borrowed from an interest reserve fund dedicated to making interest payments to the bond holders. In a memorandum dated February 11, 1997 from Defendant Dhooge of Miller & Schroeder to Bob McAdam discussed the borrowing from the Capitalized Interest Reserve Fund.

108. Early in 1996, Mr. David Platt was hired to be the Chief Executive Officer of the Rancho Cucamonga Hospital. Plaintiff is informed and believes that during late 1996 Mr. Platt complained to his superiors, Defendants Robert Kasirer, Emery Rubin and Larry Rubin that he had become aware of misallocation of bond proceeds in a manner inconsistent with the February 15, 1996, Official Statement and that as a result of raising this issue with Defendant Robert Kasirer, Emery Rubin and Larry Rubin, involving the misappropriation of $1.9 million in bond proceeds, Mr. Platt was terminated as the Chief Executive Officer of the Rancho Cucamonga Hospital. The basis of plaintiff's information and belief is the Complaint filed by David Platt in the Superior Court of California for the County of San Bernardino on August 7, 1997, the Declaration of David Platt filed in Opposition to Defendants' Motion for Summary Judgment/Summary Adjudication and the Supplemental Declaration of David Platt filed in response to supplemental Declaration of James Fedalen

1    in that action.  Plaintiff is informed and believes and therefore alleges that the Heritage

2    Defendants, the Kasirer Defendants, Miller & Schroeder, the Miller & Schroeder control

3    Defendants, and Defendants Boehm and Sabo & Green became aware of the allegations by

4    Mr. Platt during 1997, as responses to the complaint were filed in October 1997.

5        109.  By December of 1996, Defendants were aware that the Heritage Rancho

6    Cucamonga Hospital was behind schedule with respect to renovations and operations and

7    was not meeting the performance projected by the feasibility study utilized to sell the bond

8    offering in February 1996.

9        110.  During 1997, Defendants Robert Kasirer, Victor Dhooge, and Miller & Schroeder

10   were notified by the bond trustee for the first Rancho Cucamonga Hospital offering that the

11   trustee lacked funds to make monthly payments required by the indenture agreement.  On

12   September 12, 1997, letter from Mr. Luder of First Trust wrote a letter to Defendant Robert

13   Kasirer, copied to Defendant Dhooge, along with a memo with respect to the same subject.

14       111.  After the first Heritage Bond offering for the Rancho Cucamonga Hospital,

15   Defendants focused upon obtaining funding through the offer and sale of Heritage Bonds

16   to finance former hospitals which had been owned by HCA Columbia to be converted to

17   Alzheimer care facilities.  Plaintiff is informed and believes and based thereon alleges that

18   the Defendants' effort started prior to May 31, 1996, as evidenced by Defendant Boehm's

19   letter to Attorney Steven Acenia of Tallahassee, Florida in which he states, in part:

20           This letter is a brief summary of what Emery Rubin, Robert Kasirer and I are
             trying to accomplish in the state of Florida in connection with financing
21           Alzheimer's and Assisted Living health care projects with tax exempt bonds.

22   Defendants' scheme to defraud included providing assurances to prospective municipal

23   issuers that they need not concern themselves with the preparation nor truthfulness of the

24   Official Statements as the private Heritage issuer, consultants, and counsel will make sure

25   that full and complete disclosure is provided to potential investors.

26           . . . Because each project will be a "new facility" none of the bonds will be
             rated by any national rating agency and will be sold to individual investors on
27           a retail basis. Heritage, along with the various attorneys and consultants
             working on each project, will assure that full and complete disclosure is made
28           to potential investors with respect to each project in accordance with

1    applicable legal standards.
2    (emphasis added).

(Letter dated May 31, 1996 from Defendants Boehm and Sabo & Green at p. 3.)

3    112. Defendant Boehm continued to communicate with prospective municipal issuers

4    and their representatives to solicit their participation on behalf of the Heritage Defendants

5    through at least the spring of 1999. Defendant Boehm also provided advice to the Heritage

6    Defendants with respect to their solicitation of prospective public agency issuers and drafted

7    letters for the Heritage Defendants use in soliciting municipal issuers.

8    113. Plaintiff is informed and believes and based thereon alleges that during 1996,

9    Defendant Boehm, Iverson, Dhooge, Miller & Schroeder, the Heritage Defendants and the

10    Kasirer Defendants were planning on financing approximately 20 hospitals with Heritage

11    Bond offerings in the September 1996 through June 1997 time period. The basis for

12    plaintiff's information and belief is a letter dated September 6, 1996 in which Defendant

13    Boehm writes in part:

14    Pursuant to our conversation and to give your salespeople some idea of
15    timing, Robert Kasirer and I project the following for Marketing.

16    (Letter dated September 6, 1996 from Defendant Boehm to Defendant Dhooge.)

17    114. In order to facilitate the pre-offering costs, expenses and capital expenditures

18    necessary to secure the right to purchase various HCA Columbia properties, feasibility

19    studies, appraisals, and other pre-offering costs, Miller & Schroeder made loans in the

20    approximate amounts of $500,000 and $200,000 to Heritage Defendants and/or the Kasirer

21    Defendants, as these Defendants were otherwise without sufficient financial wherewithal

22    to be participants in the Heritage Bond offerings. In a memorandum for Defendant Boehm

23    to Defendants Emery Rubin, Robert Kasirer and Victor Dhooge was a draft of the seed

24    money loan and guaranty. This loan was material to each of the subsequent offerings but

25    was not disclosed to investors despite the contemplation of the parties that the loan would

26    be repaid with Heritage Bond offering proceeds, rendering all of the Official Statements

27    from December 1996 forward misleading as they contained source and uses of funds

28

5189-10/202291.3                                   36

representations which did not include repayment of the seed money loans.

115. Pursuant to the scheme to defraud, Defendants Boehm and Sabo & Green drafted the following Preliminary Official Statements and Official Statements:

| Municipal Issuer | Private Issuer | Project | Amount | Date of Official Statement |
|---|---|---|---|---|
| 1. Danforth Health Facilities Corp. | Heritage Geriatric Housing Development VII, Inc. | Danforth Long Term Care Facility Texas City | $7,295,000 | Dec. 20, 1996 |
| 2. Danforth Health Facilities Corp. | Heritage Geriatric Housing Development VIII, Inc. | Sam Houston Long Term Care Facility, Houston Texas | $10,370,000 | 35491 Mar. 3, 1997 |
| 3. Tarrant County Health Facilities Development Corp. | Heritage Geriatric Housing Development IX, Inc. | St. Joseph Long Term Care Facility, Ft. Worth | $13,420,000 | May 15, 1997 |
| 4. City of Mexico Beach, Florida | Heritage Care of Sarasota, Inc. | Heritage House of Sarasota Project | $12,305,000 | Dec. 22, 1997 |

116. Each of these bonds was issued pursuant to an Indenture and Trust and Security Agreement with Defendant U.S. Trust Company of Texas acting as Bond Trustee for the benefit of the bond purchasers. The Indenture and Trust and Security Agreement for each of these individual bond offerings was of the "stand alone" variety, whereby the security for the bond payments did not include assets or agreements relating to any of the other projects, only the project being financed by the particular offering. Nonetheless, Defendants diverted monies from the bond proceeds from these offerings to other projects including at a minimum the Rancho Cucamonga Hospital project in the 1997 to early 1998 time period.

117. Each of these Preliminary Official Statements and the Official Statements contained Estimated Sources and Uses of Proceeds sections which were false and misleading as they showed 100% of the bond proceeds being utilized in connection with the individual projects

1  without disclosing that Defendants intended to divert millions of dollars from these bond

2  offerings to the Rancho Cucamonga  Hospital shortly after the bond offerings.

3  / / /

4      118. In November 1997, an Agreement to Expand Management Services was entered

5  into between the individual Heritage entities, which were private issuers for existing and

6  prospective Heritage Bond offerings, to expand the role that Defendant Health Care

7  Holdings (for which Defendant Kasirer is general partner) would have in the management

8  of cash flow including a "Lock Box Revenue Account" to be controlled by Defendant

9  Kasirer to repay the undisclosed loan from Miller & Schroeder.  The agreement assigned

10  to Defendant Kasirer and Health Care Holdings L.P. responsibilities of the Heritage entity

11  with respect to handling and/or monitoring funds in connection with each of the projects

12  funded or to be funded by the Heritage Bonds.  On November 5, 1997, Defendant Kasirer

13  wrote a letter to Defendant Dhooge, copied to Defendants Boehm and Goldstein with the

14  enclosed executed Agreement to Expand Management Services.

15      119. Plaintiff is informed and believes and based thereon alleges that a copy of the

16  Agreement to Expand Management Services was provided to Defendants Boehm and Sabo

17  & Green.  Amongst the reasons the agreement was entered into was the failure of the

18  Heritage Defendants to make payments to Miller & Schroeder pursuant to the seed money

19  loans from Miller & Schroeder, and Defendant were aware that the Heritage Defendants

20  maintained inadequate financial controls to handle the cash flow management necessary to

21  act as a private issuer, developer and operator of the hospitals.

22      120. The Agreement to Expand Management Services was entered into approximately

23  two (2)  weeks after the Defendants answered the complaint in *Platt v. Iatros Health*

24  *Management Network,  et al.*, which alleged misappropriation of bond proceeds in

25  connection with the first Heritage bond offering for Rancho Cucamonga in February 1996.

26  The Defendants were represented in their answers in October 1997 in the *Platt* lawsuit by

27  Defendants Goldstein and Sabo & Green, through James Fedalen, Esq.  As Defendant

28  Boehm's law firm was representing Defendants in the *Platt* lawsuit as of October 1997,

1   plaintiff is informed and believes and based thereon alleges that Defendants Boehm Sabo
2   & Green were aware of the allegations of diversion of bond funds from the Rancho
3   Cucamonga Hospital project.  Plaintiff's information and belief that Defendant Boehm and
4   Sabo & Green were aware of the allegations of Mr. Platt is also based upon an August 31,
5   1999, letter from Tim Sabo of Defendant Sabo & Green to Defendant Boehm discussing the
6   Platt allegations and lawsuit.

7       121.  On January 7, 1998, Defendant Boehm and Sabo & Green's wrote a letter to
8   Defendant U.S. Trust Company of Texas and First Trust of California (then Bond Trustee
9   in connection with the Rancho Cucamonga Hospital project) with copies to Defendants
10  Robert Kasirer, Jerry Goldstein and Victor Dhooge, stating that construction draw requests
11  must be approved by Health Care Holdings, L.P. which was owned and controlled by
12  Defendant Robert Kasirer and for which he was a general partner.

13      122.  Neither (i) the Agreement to Expand Management Services, (ii) Defendants Kasirer
14  and Health Care Holdings control over bond proceeds and other project funds, (iii) the
15  Lockbox Agreement which provides for the repayment of the Miller & Schroeder loan from
16  the various Heritage bond projects, nor (iv) the *Platt* lawsuit and allegations of diversion of
17  bond proceeds, were disclosed in any of the subsequent Heritage Bond offerings starting
18  with the 1997 Mexico Beach - Sarasota Official Statement dated December 22, 1997.
19  Amongst the fraudulent representations in this Official Statement are the following:

20                      RELATIONSHIPS AMONG THE PARTIES

21      There is no direct or indirect relationship between any of the officers or
        directors of the Corporation and the officers or directors of the Manager.
22

23  (1997 Mexico Beach - Sarasota Official Statement drafted by Defendants Boehm and Sabo
24  & Green dated December 22, 1997 at p. 73.)  This same misrepresentation is repeated in all
25  of the subsequent Heritage Bond offerings.

26      123.  The former HCA Columbia hospitals being purchased with Heritage Bond offering
27  proceeds were burdened with restrictive covenants preventing their use as medical facilities
28  in order to prevent their future use in competition with remaining HCA Columbia hospitals.

For example, there is the Special Warranty Deed with Use Restrictions for the conveyance of the Danforth Long Term Care Facility in Texas City, Texas dated December 20, 1996. The Official Statements and Preliminary Official Statements were false and misleading for failure to disclose the special use restrictions and the inclusion of appraisal valuations on an "as is" basis which failed to consider the special use restrictions. The 1996 Danforth Texas City Long Term Care Facility Official Statement stated the following fraudulent misrepresentation:

### THE APPRAISAL REPORT

The Appraisal Report on the Facility, dated November 1, 1996, sets forth the opinion of Capital-Valuation Group, Newark, Delaware (the "Appraiser"), that the "as-is" market value of the Existing Facility, as of May 1, 1996, is $5,200,000.

In addition, the Appraiser has estimated the prospective market value of the tangible and intangible assets upon completion of the Renovation Project, as of August 1, 1997, is $8,000,000 and the prospective market value upon stabilization of occupancy, as of August 1, 2000 is $10,000,000.

(at p. 65 of the December 20, 1996 Official Statement.)

124. The purchase price for the Danforth Texas City Long Term Care Facility was $800,000. As he did with most, if not all of the Heritage Bond offerings, Defendant Boehm drafted wiring instructions for disbursement of bond offering proceeds. For example, Defendant Boehm drafted wire instructions for the Danforth Texas City Long Term Care Facility closing reflecting a facility purchase price of $800,986.30 and the Official Statement for this offering misrepresents the purchase price at $850;000.

125. Prior to December 1997, Defendants knew that none of the projects financed by the Heritage Bond offerings were being completed in a timely manner as projected in the Official Statements despite representations of construction guarantees, deadlines, and performance bonds in each prior Official Statement for the Heritage Bond offerings. Plaintiff is informed and believes that no construction deadline was ever met and no performance bond claim was ever made, resulting in substantial cost overruns and the failure of each project to meet the assumptions for the feasibility analysis included within the Official Statements.

126. Despite this history of failure to complete construction or renovation by the stated deadlines and cost overruns, Defendant Boehm continued to draft successive Official Statements and Preliminary Official Statements (excepting the refinancing of the Rancho Cucamonga Hospital and the additional financing of the St. Joseph Ft. Worth Long Term Care facility to be discussed in following subsections) utilizing representations of construction deadlines, performance bonds, fixed construction prices, and feasibility studies which assumed that construction costs were fixed and that construction would be completed by deadline dates. Defendants knew that such an expectation was entirely unreasonable and acted as a fraud upon the purchasers of Heritage Bonds.

127. As alleged above, from December 1996 through December 1997, Defendants raised approximately $53 million through municipal bond sales for Heritage Alzheimer care facilities. During 1997, Defendants Kasirer, Heritage Housing Development, Inc., and its officers and directors caused millions of dollars of bond proceeds to be transferred to Defendant Heritage Rancho Healthcare, Inc. for the purpose of funding the Heritage Rancho Cucamonga Hospital shortfalls and for Defendant Kasirer's own purposes. Plaintiff is informed and believes and based thereon alleges that the misallocation of bond proceeds in a manner inconsistent with the Official Statement for the other bond offerings came to the attention of Defendants Miller & Schroeder, James Iverson, Victor Dhooge, Joel Boehm, Sabo & Green and others by May of 1998 in connection with a report issued by Defendant Heritage Rancho Healthcare, Inc. received by Miller & Schroeder; and discussions were held concerning the propriety of the transfers of monies from non-Rancho Cucamonga bond offerings to finance the Heritage Hospital in Rancho Cucamonga at a time when it was the only facility being operated by the Heritage Defendants from the bond offerings underwritten by Miller & Schroeder.

128. In these conversations, Defendants Joel Boehm, Sabo & Green, Victor Dhooge and James Iverson took the position that these transfers were fraudulent and inappropriate as the bond proceeds were earmarked for other projects. Defendant Boehm wrote a letter to the Heritage Defendants in or about August of 1998 with respect to the illegality of the

1    transfers. In response, Defendant Goldstein sent two letters to Defendant Dhooge, defending

2    the practice of borrowing "surplus funds," a copy of which was provided to Defendant

3    Boehm and Sabo & Green.

4    129. Defendants Boehm, Sabo & Green, Dhooge and Iverson knew that the Heritage

5    Defendants would continue to utilize bond proceeds from prior and future offerings for

6    projects other than as represented in the Official Statements.  These Defendants developed

7    a strategy to conceal from the bond holders of the Rancho Cucamonga offering, and the

8    other bond offerings which had been the subject of illegal bond proceed transfers, the illegal

9    transfers of monies between projects.  The strategy included the decision not to inform the

10    bond holders, to maintain the illegal transfers as a tightly guarded secret, to conduct

11    additional offerings to finance the return of the illegal bond proceeds, and to structure future

12    Heritage Bond offerings with a Master Indenture agreement whereby the real estate and

13    other assets of the various projects would secure multiple bond offerings for the purpose of

14    justifying and facilitating the continuing practice of illegal transfers between the various

15    projects from the proceeds of Heritage Bond offerings.  This strategy grew out of meeting

16    at the offices of Miller & Schroeder in Solana Beach, California in June of 1998 between

17    Defendants Jerold Goldstein, Victor Dhooge, Joel Boehm, Paul Eckholm and Robert

18    Kasirer.  These Defendants knew that the Heritage Rancho Cucamonga Hospital and

19    Alzheimer care facility projects were not feasible without the continuing practice of covertly

20    diverting funds from new Heritage Bond offerings.

21    130. At or about this time, Defendant Dhooge asked his superior, Defendant Iverson,

22    whether the credit committee of Miller & Schroeder should be informed of the transfer of

23    monies to the Heritage Rancho Cucamonga Hospital from the other bond offerings to fund

24    Alzheimer care facilities.  Defendant Iverson responded that Defendant Dhooge was not to

25    inform the credit committee but was to maintain the information in secret.  Plaintiff is

26    informed and believes that despite the instruction from Defendant Iverson to Defendant

27    Dhooge, members of the credit committee of Miller & Schroeder responsible for approving

28    Heritage Bond offerings learned of the illegal transfers at some time during 1998.

1    131.  The next Heritage Bond offering after the June 1998 meeting at the offices of Miller

2    & Schroeder in Solana Beach, California was a $11,090,000 offering in July 1998 which

3    was for the purpose of financing an Alzheimer care facility in Austin, Texas known as 1998

4    Danforth Austin.  It was sold pursuant to a Master Indenture and was the first Heritage Bond

5    offering sold pursuant to a Master Indenture which contemplated cross collateralization of

6    Heritage Bonds by more than one project to be funded with Heritage Bonds pursuant to the

7    scheme to conceal and continue the illegal transfers of bond proceeds to projects other than

8    those represented to be funded by the particular offering.  Despite the anticipated cross

9    collateralization of Heritage Bonds, the continuing transfer of funds from Heritage Bond

10    proceeds violated the Master Indenture, the loan agreement, and acted as a fraud upon the

11    bond

12    132. In an effort to conceal the illegal transfers of bond proceeds, cost overruns, and

13    delays in connection with development of the Heritage Rancho Cucamonga Hospital, and

14    the misapplication of bond proceeds, and to continue to enrich themselves from their scheme

15    to defraud, in 1998 Defendants structured and offered and sold municipal bonds for which

16    the Desert Hot Springs Public Financing Authority acted as the municipal issuer, Defendant

17    Heritage Rancho Healthcare, Inc. acted as the private conduit issuer, and Defendants Health

18    Care Holdings, LLC and CareContinuum, LLC (both owned and controlled by Defendant

19    Robert Kasirer) acted as managers.

20    133. Pursuant to the scheme to defraud, the August 20, 1998, Desert Hot Springs Official

21    Statement was drafted by Defendants Boehm and Sabo & Green, and published by the

22    municipal issuer and the private issuer, Defendant Heritage Rancho Healthcare Inc.  The

23    cover page of the Desert Hot Springs Official Statement drafted by Defendant Boehm and

24    Sabo & Green represents that the bonds:

25    ... are being executed and delivered to finance (i) the refunding of the
outstanding California Communities Local Public Improvements Financing
26    Authority Health Care Revenue Bonds (Rancho Cucamonga Hospital and
Medical Center Project) 1996 Series A Tax-Exempt and 1996 Series B
27    Taxable, (ii) the prepayment of certain subordinated notes issued by the
Corporation in connection with the Facility, (iii) the repayment of certain
28    indebtedness incurred by the Corporation in constructing interior

improvements, purchasing furniture, fixtures and equipment and for working capital purposes, (iv) the construction of interior improvements to various areas of the Facility which will contain various outpatient programs and equipping such programs (collectively, the "Project"), (v) working capital in connection with the Project, (vi) a deposit to the Reserve Fund for the 1998 Certificates, (vii) accrued interest with respect to the 1998 Certificates, and (viii) certain costs in connection with the execution and delivery of the 1998 Certificates. See "THE FACILITY" and "ESTIMATED SOURCES AND USES OF FUNDS" herein.

These statements and further statements were false and misleading for failure to disclose that the purpose of the bonds was to finance the payment of illegal transfers from other projects funded by Heritage Bonds, construction cost overruns, and operating shortfalls.

134. As previously alleged, during the first half of 1988, certain Defendants became aware of the diversion of bond proceeds to the Heritage Rancho Cucamonga Hospital from the Heritage Bonds for the purported purpose of financing the individual Alzheimer care facilities pursuant to the "stand alone" indentures. The Defendants were also dealing with substantial cost overruns, construction delays and the inadequate capitalization of the various projects at that time. In the meetings in May and June of 1998, Defendants decided to address those problems by refinancing the Heritage Rancho Cucamonga Hospital and the St. Joseph Ft. Worth Long Term Care Facility which had experienced significant construction delays and cost overruns.

135. By an Official Statement drafted by Defendants Boehm and Atkinson Andelson Loya, Ruud. & Romo of Solana Beach, California, dated October 5, 1998, Defendants sold an additional $6,855,000 in Heritage Bonds for the purported purpose of providing additional financing for the St. Joseph Ft. Worth Long Term Care Facility. These Heritage Bonds were issued pursuant to a supplement to the stand alone indenture originally dated May 1, 1997, and which continued to be a "stand alone" indenture.

136. The October 1, 1998 Tarrant Ft. Worth Official Statement drafted by Defendant Boehm is false and misleading for among other reasons, it contains and is supported by reference to an appraisal report, a financial feasibility study, and a market feasibility study. There was no disclosure anywhere in the Official Statement of cost overruns and delays based upon the original feasibility studies utilized to sell the 1997 St. Joseph Ft. Worth

Heritage Bonds.

137. The 1998 Tarrant Ft. Worth Official Statement includes statements with respect to the use of funds, including the following:

> The proceeds derived from the sale of the 1998 Notes will be paid to the Trustee and will be used for (i) the repayment of certain indebtedness incurred by the Company in purchasing furniture, fixtures and equipment; and other loans (the "Other Loans"); (ii) certain start-up costs with respect to the Facility, (iii) a Debt Service Reserve Fund, and (iv) certain costs of issuance with respect to the 1998 Notes. See "THE FACILITY" and "ESTIMATED SOURCES AND USES OF FUNDS" herein.

Nowhere in the Official Statement, including exhibits thereto, is there any disclosure of the amount or terms of these "Other Loans." Plaintiff is informed and believes that these "Other Loans" include improper transfers from other bond offering proceeds, and that this additional financing was designed to finance the repayment of these illegal and fraudulent transfers.

138. As previously alleged, the Defendants had discussions concerning the diversion of Heritage Bond proceeds from the Alzheimer care facilities to the Heritage Rancho Cucamonga Hospital. Defendants decided to structure future Heritage Bond offerings, pursuant to a Master Indenture which could cover more than one project, to facilitate the known practice of the Heritage Defendants of using bond proceeds for different projects other than the project for which the bonds were offered and sold.

139. In furtherance of the scheme to defraud, the Defendants offered and sold the following Heritage Bonds pursuant to a single master indenture with the indenture being amended to accommodate each new offering:

| Municipal Issuer | Private Issuer | Project | Amount | Date of Official Statement |
|---|---|---|---|---|
| 1. Danforth Health Facilities Corp. | Heritage Healthcare of America, Inc. | Heritage Duval Gardens, Austin Texas | $11,090,000 | 35985 |
| 2. Tarrant County Health Facilities Development Corp. | Heritage Healthcare of America, Inc. | Heritage Eastwood Gardens, Houston Texas | $11,320,000 | Nov. 13, 1998 |

| 3. City of Mexico Beach, Florida | Heritage Healthcare of America, Inc. | Heritage house of Seminole, Florida | $7,230,000 | Dec. 21, 1998 |
|---|---|---|---|---|
| 4. Tarrant County Health Facilities Development Corp. | Heritage Healthcare of America, Inc. | Heritage Valley Garden, Brownsville Texas | $11,715,000 | 34403 |

While these Official Statements stated that the Heritage Bonds were being offered and sold pursuant to a Master Indenture, this statement and other statements including the Estimated Sources and Uses of Bond Proceeds were misleading for failure to disclose that the reason for the Master Indenture was Defendants' plan and business practice, which was well established before these bond offerings, of utilizing bond proceeds for projects other than represented in the Official Statement.

140. Although the above described Heritage Bond offerings were issued pursuant to a Master Indenture in which each of the four projects acted as security for all four bond offerings, the Official Statements continued the practice of representing that the bond proceeds would be utilized only in connection with the particular project being financed by the offering. For example the cover page of the 1998 Tarrant East Houston Official Statement for the Heritage Eastwood Gardens project stated:

> The 1998 Bonds are being issued to undertake the financing of (i) the acquisition of Columbia Doctors Hospital-East Loop, a closed acute care hospital located at 9339North Loop East, in the City of Houston, Harris County, Texas, to be renamed Heritage Eastwood Gardens, consisting of 82,400 square feet on 6.0 acres of land with 268 parking spaces (the "Existing Facility" and after issuance of the 1998 Bonds, the "Facility'), (ii) the renovation of the Existing Facility into a continuum of care Alzheimer Facility and Geriatric Center consisting of 151 Alzheimers nursing care beds, a behavioral healthcare center, a comprehensive outpatient rehabilitation facility, a research and teaching center, a senior healthcare clinic, an adult day care/senior citizens center, various therapy areas, common areas, administrative offices and support areas (collectively, the "Facility'), (iii) the initial deposit to an Indigency Fund, (iv)certain start-up and funded interest costs with respect to the Facility, (v) a Debt Service Reserve Fund, and (vi) certain costs of issuance with respect to the 1998 Bonds. See "THE FACILITY" and "ESTIMATED SOURCES AND USES OF FUNDS" herein.

(Cover page to 1998 Tarrant East Houston Official Statement dated November 13, 1998.)

The representations were false and misleading as Defendants intended to and did utilize

offering proceeds from this offering for other projects, including approximately $900,000 which was diverted to purchase land adjacent to the Heritage Rancho Cucamonga Hospital in anticipation of a third Heritage Bond offering planned for 1999 to expand the Heritage Rancho Cucamonga Hospital.

141. Defendant Jerold Goldstein signed the 1998 Tarrant East Houston Official Statement knowing it was misleading and that it would be distributed to prospective bondholders. Defendant Goldstein also personally participated in the illegal transfer of funds from the 1998 Tarrant East Houston project by, among other things, executing requisition certificates for delivery to the Bond Trustee, Defendant U.S. Trust, to obtain funds to be utilized for the illegal transfers.

142. In furtherance of the scheme to defraud, Miller & Schroeder offered and sold bonds for which the City of Chicago, Illinois acted as the municipal issuer, and Defendant Heritage Care of Chicago Inc. acted as the private conduit issuer, by Official Statement dated July 24, 1998 in the amount of $17,275,000, for the purported purpose of renovating a former hospital to an Alzheimer care facility. As with the other Heritage Bond offerings, the project suffered from cost overruns, estimated at in excess of $2,000,000 by the Bond Trustee, Defendant U.S. Trust. The Heritage Defendants and the Kasirer Defendants wrongfully diverted bond proceeds to their own purposes. The facility never opened for business.

143. The Official Statements for the Heritage Bonds were distributed amongst the brokers employed by Miller & Schroeder. Augusta read and relied upon the Official Statements and the misrepresentations contained therein when offering and selling Heritage Bonds to clients. The Official Statements were prepared in part for distribution to the sales force of Miller & Schroeder for them to rely upon and solicit purchases of Heritage Bonds.

144. In addition to being provided with and reading the Official Statements, Augusta was required to attend sales meetings with respect to the Heritage Bonds on monthly or more frequent time intervals. The primary speakers at these meetings touting the Heritage Bonds were Defendants Robert Kasirer and Victor Dhooge. Plaintiff is also informed and believes

that Defendant Goldstein attended one or more of these sales meetings.  On September 17, 1998, Defendant Dhooge wrote a memo  to Defendant Kasirer with an outline for the presentation to the sales force for the 1998 Tarrant Fort Worth bond offering, to be held September 23, 1998.   On February 23, 1999,  Defendant Dhooge wrote a memo to Defendant Kasirer and Defendants Boehm and Leo Dierckman with respect to a sales meeting for the 1999 Tarrant Brownsville offering, the last Heritage Bond offering. Defendant Boehm also received copies of additional memoranda with respect to the marketing of Heritage Bonds by the sales force of Miller & Schroeder.

145. Defendant Dhooge solicited lists of prospective investors so that Miller & Schroeder's sales force could better market the Heritage Bonds.  On March 21, 1997, Defendant Dhooge's wrote a letter to a San Diego local Alzheimer's Association stating: To assist in this worthwhile effort, Miller & Schroeder would like to acquire the donor list from the Alzheimer's Association.   The donors would only be solicited on the upcoming tax-exempt issue that will finance the St. Joseph Long Term Care Facility in Fort Worth, Texas.

146. The brokers had written advertisements approved by the Legal Department of Miller & Schroeder.  The advertisements stated that a copy of the Official Statement could be obtained by contacting the broker at Miller & Schroeder.  The advertisements also stated:

> This is neither an offer to sell nor a solicitation to buy these securities. Such offering is made only by means of the Official Statement, subject to prior sale and change in price in such jurisdiction as they may be legally offered.

In each instance in which an offer was made, the broker at Miller & Schroeder would cause to be sent to the offeree the Official Statement for that Heritage Bond as a matter of custom and practice and as required by law.

147. In addition to utilizing the Official Statements for sales at the time of the initial offering of that particular Heritage Bond, the Official Statements were utilized in connection with sales of Heritage Bonds in secondary or non-issuer transactions by Miller & Schroeder.

148. Miller & Schroeder retained an accounting firm to determine the extent of known

1    difficulties being experienced by the Heritage Defendants and each of the projects financed

2    by the sale of Heritage Bonds, with respect to financial controls, inter-project monetary

3    transfers of bond proceeds, continuing difficulties in construction resulting in cost overruns

4    and delays and cash management issues.  These issues were addressed in a meeting in

5    February 1999 between Heritage Defendant representatives and Miller & Schroeder

6    representatives, and the Heritage Defendants agreed to provide additional information.

7        149. Among the information that Miller & Schroeder did have by the February 1999

8    meeting, were figures with respect to cost overruns as indicated in the January 25, 1999,

9    memo to Defendant Dhooge from Defendant Bertolini setting forth cost overruns of in

10   excess of a million dollars in connection with each of the following projects: (1) Danforth

11   Texas City; (2) Danforth Sam Houston Gardens; (3) Tarrant St. Joseph Ft. Worth Gardens;

12   and (4) Mexico Beach Sarasota.  (Plaintiff does not adopt the dollar numbers from this

13   memo as accurate, as will become clearer; no financial information disseminated by the

14   Heritage Defendants can be relied upon).  Despite this knowledge and the inability of the

15   Heritage Defendants to provide information with respect to their cash flow management, the

16   Defendants conducted an additional Heritage Bond offering known as the 1997 Tarrant

17   Brownsville offering in March of 1999 and knowingly failed to disclose to investors the cost

18   overruns, construction delays, known financial difficulties being suffered by the Heritage

19   Defendants and their inability to meaningfully respond to questions concerning cash flow

20   management.

21       150. When Miller & Schroeder representatives received additional information several

22   months later in 1999, they realized that the problems being suffered by the Heritage

23   Defendants were worse than had been previously known.  Miller & Schroeder retained the

24   accounting firm of Larson, Allen Weishair & Co., who are known by the acronym

25   ("LAWCO").  LAWCO conducted an examination of financial records maintained by the

26   Heritage Defendants in connection with the various projects.  Amongst the information

27   reviewed by LAWCO was financial information forwarded under cover of a letter dated

28   July 2, 1999, from Stephan P. Goodman, CFO, of Heritage Healthcare of America. Inc. to

Michael McConnell, CPA. (Note: Augusta has not located item 7 to Mr. Goodman's letter, a schedule of Intercompany Transfers from inception through June 30,1999).

151. LAWCO reported their findings in at least two meetings:

1.   in the Miller & Schroeder office in Solana Beach, California in attended by Defendant Iverson, Defendant Foldstein, Diane Colby of Defendant Health Care Holdings, Leo Kierckman of Defendant CareContinuum, one or more representatives of LAWCO, and William Barber of Defendant U.S. Trust Company who attended with counsel by telephone; and

2.   an August 11, 1999, meeting in the offices of Miller & Schroeder in Minneapolis, Minnesota attended by representatives of Miller & Schroeder and Defendant U. S. Trust.  Plaintiff is informed and believes and based thereon alleges that the findings of LAWCO included the following:

   a.  approximately $9,300,000 in inter-company transfers;

   b.  a practice of Heritage to reimburse Management Company operating deficit loans through draws (the operating deficit loan was originally funded by Heritage Bond Proceeds) as a priority over other items;

   c.  phoney invoices and monies paid to principals without invoices;

   d.  at least $13,000,000 in "diversions";

   e.  in January 1999, Defendant Kasirer caused four different Heritage projects to pay to Defendant Health Care Holdings draws as repayment of operating deficit agreement loans, although this Defendant was required to continue to provide these loans

   f.  management company books were taken away in March 1999 (Defendant Kasirer's companies which acted as the manager of the projects resigned in or about July 1999);

   g.  $900,000 had been diverted from the recent 1998 Tarrant East Houston project to purchase land next to the Rancho Cucamonga Hospital for the anticipated expansion which the Defendants had planned to finance during

1    1999 with the sale of a third Heritage Bond offering for the Heritage Rancho

2    Cucamonga Hospital;

3    h.  based upon checks written out of the management company's account, it was

4        overdrawn;

5    i.  improper construction advances in connection with the projects;

6    j.  Heritage Bond proceeds were utilized to pay for Hawaiian and Las Vegas

7        vacations, which were billed to the projects, for Defendant Kasirer and his

8        wife and certain Heritage Defendants and their wives.  This list is not all

9        inclusive of the scope of the LAWCO report and LAWCO did not provide

10       details with respect to all improper financial transactions.

11

12   **3.  Official Statements were false and/or misleading in the following respects.**

13   **A.  Loans from Miller & Schroeder to the Heritage Defendants.**

14       152. The Official Statements contained a section titled "Relationships Among The

15   Parties," for the purpose of disclosing conflicts of interest and related party transactions, that

16   stated, "[T]here is no direct or indirect relationship between any of the officers of the

17   Company (the Heritage Defendants) and the officers and directors of the Manager (the

18   Kasirer Defendants)."

19       153. The Defendants failed to disclose at least two loans totaling approximately

20   $700,000 from Miller & Schroeder to the Heritage Defendants.  Money was transferred

21   pursuant to these loans before any of the Heritage Bonds were underwritten.  These loans

22   provided seed money to the Heritage Defendants in preparation for underwriting the

23   Heritage Bonds.

24       154. The Official Statements' representations in the section titled "Relationships Among

25   The Parties" was false and misleading because there was no disclosure of loans from Miller

26   & Schroeder, no disclosure of pre-existing business relationships involving Defendants

27   Robert Kasirer, Jerold Goldstein, Larry Rubin, Emery Rubin and James Iverson, and no

28   disclosure of the continuing relationship between Miller & Schroeder and the Heritage

1 Defendants and the Kasirer Defendants as evidenced by the Agreement to Expand
2 Management Services.

3 155. The Official Statements contained a section titled "Estimated Sources and Uses of
4 Funds" describing the expected application of Heritage Bond proceeds. The descriptions
5 were false and misleading because, among other reasons, the use of Heritage Bond proceeds
6 to repay the loans from Miller & Schroeder should have been, but was not, disclosed in the
7 Official Statements.

8 **B. Cost overruns and construction delays for each project.**

9 156. The Official Statements for the Heritage Bonds contained representations regarding
10 the use of investor proceeds to renovate the project property and operate it as a health care
11 facility. In addition to the "Estimated Sources And Uses Of Funds" section, the Official
12 Statements contained a section titled "Construction Contract and the Contractor" which
13 stated, "[U]pon issuance of the (Heritage Bonds), the Company (the Heritage Defendants)
14 will enter into a construction contract . . . to renovate the Existing Facility, pursuant to a
15 guaranteed maximum price contract in the amount of . . . In connection with the Renovation
16 Project, the contractor will guarantee completion of the Renovation Project and will provide
17 a performance bond . . . The Construction Contract requires the Contractor to complete the
18 Renovation Project by . . . , subject to certain limited extensions, and to guarantee
19 completion of the Renovation Project." (emphasis added)

20 157. Based on these express representations appearing in the Official Statements,
21 prospective investors were promised that the proposed facility renovation would be
22 completed for the stated price by the stated completion date. Accordingly, the Official
23 Statements contained feasibility studies and debt service coverage calculations based on the
24 stated construction cost and completion date. It was therefore known to Defendants that any
25 delay or cost overruns in renovating the facility would delay operation of the facility
26 resulting in cash flow shortages.

27 158. However, from the beginning of 1996, the Heritage Defendants and the Kasirer
28 Defendants could not complete the renovation and thus commence operation of the proposed

1    health care facilities within the specified time frame and within the "guaranteed" cost

2    allocated pursuant to each Heritage Bond structured by Miller & Schroeder.

3        159. Knowing that the promised cost "guarantee"and completion date were not being

4    met for the renovation projects, Defendants continued to offer and sell successive Heritage

5    Bonds using Official Statements containing the same representations but without disclosing

6    to prospective investors these prior cost overruns, delays, and resulting cash flow shortages.

7        160. Knowing that the promised cost "guarantee"and completion date were not being

8    met for the renovation projects, Miller & Schroeder continued to underwrite successive

9    Heritage Bonds using Official Statements containing feasibility studies and debt service

10    ratio calculations based on progressively unreliable renovation costs and completion dates.

11        161. Defendants knew during the offer and sale of Heritage Bonds that the promised

12    "performance bonds" for project renovations were illusory or nonexistent.

13    **C. Negative information regarding the Kasirer Defendants.**

14        162. The Official Statements prepared by the attorney Defendants and used by Miller

15    & Schroeder in connection with the Heritage Bonds contained a section describing the

16    background and accomplishments of the Kasirer Defendants as the lead principal of each

17    Manager of each health care facility.  Robert Kasirer was described as a seasoned corporate

18    executive experienced in developing and managing retirement and health care facilities.  For

19    example, the representation was made that "[F]rom 1986 to 1995, Mr. Kasirer developed

20    retirement communities, assisted living facilities and health care facilities for not-for-profit

21    owners as a fee developer and owner of a respiratory therapy company."  Robert Kasirer

22    was also described as a lawyer and member of the New York Bar Association who has

23    lectured extensively and authored articles on the retirement housing industry.   The

24    experience and integrity of the Kasirer Defendants, including Robert Kasirer, was important

25    to investors because revenue derived from operation of the facility by the Kasirer

26    Defendants was the primary source of funds available for debt service payments for each

27    respective Heritage Bond.   Representations in the Official Statements about the

28    achievements of the developer and manager were material because without an established,

reputable and financially strong developer and manager, Heritage Bond holders had little, if any, assurance that the proposed project would be developed and operated and valued as represented in the Official Statements.

163. The Official Statements prepared by the attorney Defendants and used by Miller & Schroeder in connection with the Heritage Bonds failed to disclose negative information regarding the Kasirer Defendants including:

(a) several lawsuits in the last eight years alleging wrongful acts, including fraud, against Robert Kasirer in various business transactions including development of real property;

(b) unpaid obligations, totaling hundreds of thousands of dollars, of Robert Kasirer arising from tax liens and unsatisfied judgments;

(c) an IRS investigation involving Robert Kasirer's participation in the tax-exempt status of municipal securities financing real property development involving Defendants Emery Rubin and Jerold Goldstein;

(d) (for those eight Heritage Bonds marketed after August of 1997) the *Platt* lawsuit filed August 7, 1997, in California, against Robert Kasirer, Heritage Housing Development, Inc., Heritage Rancho Healthcare, Inc., Larry Rubin, and Emery Rubin, alleging wrongful acts such as misappropriation of bond proceeds at the Rancho Cucamonga Heritage facility;

(e) (for those six Heritage Bonds marketed after July of 1998) a lawsuit was threatened and eventually filed July 22, 1998, in California, against Defendants Robert Kasirer, Health Care Holdings, Heritage Rancho Healthcare, Inc., and others alleging wrongful acts such as fraud in the management of the Rancho Cucamonga Heritage facility. This action entitled *Cornerstone Health Management Company v. Heritage Rancho Healthcare Inc.*, California Superior Court for the County of Los Angeles, Case No. SC053468, alleges fraud against these Defendants on behalf of a company which was retained to provide a substantial portion of the management services pursuant to the management agreement between the Heritage Rancho Cucamonga Hospital and Robert Kasirer doing business as IHN. The Complaint states:

During January 1997, before Cornerstone entered into the Subcontract, Kasirer as the authorized management representative of IHN and Heritage stated to Cornerstone's chief executive Eric Reiseberg on several occasions in person and over the telephone that "We [referring to Kasirer and )HM are not interested in operations; we are `deal' people," or using words substantially to that effect. Representatives of Heritage, including Emery Rubin and Kasirer, further represented to Eric Reiseberg during January 1997, that they were dissatisfied with the Hospital's existing chief executive officer and management team. During one in person conversation with Robert Kasirer, Eric Reiseberg was told that Heritage wanted to "flush the garbage" which Kasirer explained meant the existing management team conducting the day-to-day operations at the Hospital.

(Complaint filed July 22, 1998 at ¶ 13.)

(f) thus by July 1998, Defendants knew that the Chief Executive Officer of the Heritage Rancho Cucamonga Hospital hired in early 1996, David Platt, had filed a lawsuit again Robert Kasirer, Emery Rubin, Larry Rubin, and Heritage Housing Development, Inc. alleging diversion of bond proceeds and wrongful termination in violation of public policy and that Mr. Platt's successor, Cornerstone Health Management Company had also filed an action against Defendant Kasirer alleging fraudulent inducement to enter into a management contract for the Heritage Rancho Cucamonga Hospital.

164. The Official Statements prepared by the attorney Defendants and used by Miller & Schroeder in connection with the offer and sale of Heritage Bonds also contained a "Litigation" section stating in part, "[T]he Company (the Heritage Defendants) has advised that no litigation or proceedings are pending or, to its knowledge, threatened against it or the Facility or the transactions described herein **or which might have a material adverse effect** on it or the Facility or the transactions described herein." (emphasis added)  This representation was made misleading by the Defendants' failure to disclose, in the appropriate Heritage Bond Official Statements, the litigation described in the preceding paragraph.

**D.  Restrictive covenants burdening project property.**

165. The Official Statements prepared by the attorney Defendants and used by Miller & Schroeder in connection with the Heritage Bonds contained a section describing "Security for the Bonds" which stated in part, "[T]o further secure the payments due pursuant to the

1    Note, the Company (the Heritage Defendants) will grant to the Mortgage Trustee a first

2    mortgage lien on the land and improvements constituting the Facility and a first priority

3    security interest in the personal property portions of the Facility and the Revenues subject

4    only to Permitted Encumbrances, as defined in the Deed of Trust." Thus, Heritage Bond

5    holders were the beneficiaries of a first deed of trust on the health care facility property.

6        166. The Official Statements prepared by the attorney Defendants and used by Miller

7    & Schroeder in connection with the Heritage Bonds also contained an "Appraisal Report"

8    section setting forth a current "as is," appraised market value for the hospital facility

9    securing the Heritage Bonds.

10        167. However, the appraiser valued the property based on the assumption that title was

11   held in fee simple without any liens or encumbrances. Thus, the "as is" appraised market

12   value for each hospital was based on the assumption that title was in fee simple without any

13   liens or encumbrances.

14        168. Defendants knew that every distressed hospital property purchased from

15   Columbia/HCA with Heritage Bond proceeds contained a restrictive covenant running with

16   the land that prohibited use of the property as a hospital, surgery center, birthing facility,

17   laboratory, or other similar ancillary medical service. This encumbrance was not considered

18   in the "as is" appraised market value disclosed to prospective investors in certain Heritage

19   Bonds including 1996 Danforth Texas City, 1997 Danforth Sam Houston, 1997 and 1998

20   Tarrant Fort Worth, 1997 Mexico Beach Sarasota, 1998 City of Chicago, 1998 Tarrant

21   Houston, 1998 Mexico Beach Seminole, and 1999 Tarrant Brownsville. Thus, the "as is"

22   appraised market value was manipulated or inflated by Defendants in each respective

23   Official Statement in light of the undisclosed restrictive covenants burdening the collateral.

24        169. Furthermore, Heritage Bondholders were not adequately advised of the recent

25   transaction history regarding the facility real property being sold and pledged as security for

26   bond holders, and key transaction terms such as price, fair market value, liens, restrictive

27   covenants, and the identity and profit of participants to the transaction such as the Kasirer

28   Defendants.

170. Heritage Bond holders were misled by not knowing the true and complete assumptions and limiting conditions supporting the appraisals, opinions of value, and feasibility reports for the facility real property purchased with bond holder proceeds and pledged as collateral to secure the bonds. The present fair market value of the pledged property was material to prospective investors' calculation of the value-to-lien ratio which measures the adequacy of the collateral securing their investment.

**E. The Heritage Defendants and the Kasirer Defendants' business practice of using bond funds for projects other than for which they were raised.**

171. Each Heritage Bond Official Statement contained an Estimated Sources and Uses of Funds section which showed 100% of the Use of Bond funds to be expanded in connection with the Bond Offering or one specific project which was the subject of the offering. The Official Statements prepared by attorney Defendants and used by Miller & Schroeder in connection with the Heritage Bonds contained a section describing the security for the bonds including a Project Fund. The Project Fund was funded from bondholder proceeds. The Project Fund was held by the trustee and subject to a lien and charge in favor of the bondholders. The Official Statements advised bondholders that, as provided in the Indenture, the trustee shall disburse amounts from the Project Fund in accordance with requisitions submitted by the Heritage Defendants, substantially in the form attached to the Indenture, executed by an authorized officer or designated representative of the Heritage.

172. The form attached to the Indenture required certification that the funds being requisitioned for disbursement were for the project for which the bonds were sold. The Corporation certifies as follows:

> (i) the amount to be paid hereunder, as set forth above, represents an amount incurred by the Corporation as part of the <u>costs of issuance of the 1998 Series Bonds or the cost of the Project to be financed with proceeds of the 1998 Series Bonds</u>, such payment is not being requested in advance of the time, if any, fixed for payment, and such payment will be made in accordance with usual and customary practice existing conditions; (emphasis added).

173. The Official Statements contained references to feasibility studies and their findings and feasibility studies were attached as exhibits to the Official Statements. These feasibility

57

1   studies were prepared based upon the assumption that bond proceeds would be utilized in

2   connection with the cost of issuance or the cost of the Project to be financed as described

3   in the Official Statement.

4       174. The Official Statements contained a Bondholder's Risks section, which stated that

5   the, Company (Obligor under the Loan Agreement) will have no assets other than the Real

6   Estate Facility being purchased with Bond Proceeds, and that the sole source of revenue

7   would be from that real estate facility.

8       175. There was no disclosure of Defendants' plan and course of business operations

9   whereby bond proceeds were frequently transferred from one project to another, without the

10  knowledge or consent of the bondholders, to suit the whim of the Heritage Defendants and

11  the Kasirer Defendants, and were otherwise diverted for Defendants' own uses, and each

12  of the above disclosures was false and misleading as they were part of the same fraudulent

13  representation that bond proceeds would be utilized only in connection with the project for

14  which they were raised.

15

16                          **FIRST CAUSE OF ACTION**
                                    **Negligence**
17          **(Against All Defendants Except the Kasirer Defendants)**

18      176. Plaintiff incorporates Paragraphs 1 through 175 herein.

19      177. By doing the actions set forth herein, and failing to properly design, create,

20  investigate, research, prepare, operate, offer for sale, or sell these Heritage Bonds, and

21  failing to properly construct the facilities, and failing to manage and segregate and use the

22  bond proceeds and funds for the facilities, the Defendants were negligent.

23      178. These Defendants had and voluntarily assumed a duty to properly and honestly and

24  diligently design, create, investigate, research, prepare, operate, offer to Augusta for sale,

25  and sell these Heritage Bonds, and to properly manage the funds and construct the facilities,

26  and to disclose their facilities to do so to Miller & Schroeder and Augusta.  Defendants

27  failed to do so.  Defendants also had a duty to fully disclose all aspects and material facts

28  surrounding the bonds, and failed to do so.

179. By their acts and statements set forth above, Defendants fell below, and failed to comply with, the standards of care, rules, regulations and obligations required of such professionals, and breached their duties to Augusta, and thus were negligent.

180. The Miller & Schroeder Corporate Defendants and Miller & Schroeder individual Defendants were negligent in entering into business with the other Defendants for the Heritage Bonds, in failing to investigate and discover due diligence about the Heritage Defendants, Kasirer, and the Kasirer entities, and in failing to properly underwrite the bonds.  They were also negligent in failing to disclose known material facts to Augusta and his clients.

181. The attorney Defendants were negligent in performing their duties as bond counsel, failing to properly conduct due diligence and/or disclose all the material facts to Augusta and the bond investors, and Augusta as an employee and salesperson of Miller & Schroeder was a direct and intended beneficiary of their duties as bond counsel.  The attorney Defendants knew or should have known that Augusta was relying upon them for accurate and complete due diligence, information and disclosure and failed to provide it while nevertheless voluntarily undertaking such duty.

182. The Heritage Defendants and U.S. Trust Defendants were negligent in failing to disclose all material facts to Augusta and bond investors, and in attempting to undertake management and operation of the band facilities without requisite credibility, experience, honesty, and/or backgrounds to do so.

183. As a result of Defendants' negligence in doing the acts set forth herein, Augusta has suffered financial loss to be shown at trial, in excess of Ten Million Dollars ($10,000,000.00).

## SECOND CAUSE OF ACTION
### Breach of Fiduciary Duty
### (Against the Miller & Schroeder Individual and Entity Defendants)

184. Plaintiff incorporates Paragraphs 1 through 183 herein.

185. Defendants owed a fiduciary duty to Augusta to deal with him in the highest degree

of good faith, integrity and fair dealing in the design, creation, operation, marketing, research, preparation, offering for sale and sale of the Heritage Bonds, and to present him with legitimate and honest and suitable products to sell to his clients. Augusta relied upon and trusted Defendants to do so, and they solicited and encouraged this trust. Defendants' fiduciary duties arose from their position as Augusta's employer and as designers, creators, marketers, operators, marketers, researchers, preparers and underwriters of bonds for Augusta to sell to his clients, lead investor and their directorship position, their agreements with Augusta, and from their course of dealing with Augusta, their representations to him about the Heritage Bonds and bonds offered for sale in general, and others, including the duty not to do any acts which caused damage to Augusta's clients and to Augusta's business and profession.

186. In doing the things herein alleged, Defendants breached their fiduciary duties to Augusta. Augusta was damaged as a legal result of Defendants' breaches of fiduciary duty.

187. Defendants' conduct described herein was willful, wanton, reckless, and done without regard to Augusta's rights and interests. Defendants' actions were intentionally done when Defendants knew or should have known the substantial probability that its conduct would harm Augusta. As such, Defendants' conduct justifies the award of exemplary and punitive damages.

### THIRD CAUSE OF ACTION
#### Constructive Fraud
#### (Against the Miller & Schroeder Defendants)

188. Plaintiff incorporates Paragraphs 1 through 187 herein.

189. Although they owed Augusta a fiduciary duty, Defendants sought to gain and did gain an advantage over Augusta by means of misrepresentations as heretofore alleged.

California Civil Code section 1573 defines constructive fraud and provides as follows:

Section 1573. Constructive Fraud.

Constructive fraud consists:

1. In any breach of duty which, without an actually fraudulent intent, gains an

5189-10/202291.3

60

advantage to the person in fault, or anyone claiming under him, by misleading another to his prejudice, or to the prejudice of anyone claiming under him; or

/ / /

2. In any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud.

190. By committing the acts and making the statements set forth herein, the Defendants are guilty of constructive fraud. As a result of Defendants' constructive fraud, Augusta has suffered damages and financial loss in amounts to be proven at trial.

### FOURTH CAUSE OF ACTION
**Intentional Interference With
Prospective Economic Advantage
(Against All Defendants except U.S. TRUST)**

191. Plaintiff incorporates Paragraphs 1 through 190 herein.

192. The relationships between Augusta and his clients and between Augusta and the securities industry constituted economic relationships which contained the probability of future economic benefits to Augusta. These Defendants knew of these relationships and their actions disrupted the relationships. Defendants' actions described above were done intentionally, and Defendants knew when they committed the actions described herein that the interference or disruption was certain or substantially certain to occur as a result, such that Augusta was and would be denied the economic benefits to which he was entitled. Defendants' actions described above were wrongful apart from the interference itself, as set forth herein.

193. As a result of Defendants' intentional interference with Augusta's prospective economic relations, Augusta suffered damages and financial loss, in amounts to be proven at trial.

### FIFTH CAUSE OF ACTION
**Negligent Interference With Prospective Economic Advantage
(Against All Defendants)**

194. Plaintiff incorporates Paragraphs 1 through 193 herein.

195. The relationships between Augusta and his clients and between Augusta and the securities industry constituted economic relationships which contained the probability of future economic benefits or advantages to Augusta.  These Defendants knew of these relationships and their actions were wrongful.  It was reasonably foreseeable that this wrongful conduct would interfere with or disrupt these relationships, such that Augusta was and would be denied the economic benefits to which he was entitled.  Defendants' by their actions described above were negligent and breached their duty(ies) and/or failed to exercise due care with respect to Augusta, and those actions were wrongful apart from the interference itself, as set forth herein.

196. As a result of Defendants' negligent interference with Augusta's prospective economic relations, Augusta suffered damages and financial loss, in amounts to be proven at trial.

### SIXTH CAUSE OF ACTION
**Interference With Contractual Relations**
**(Against All Defendants Except Miller & Schroeder)**

197. Plaintiff incorporates Paragraphs 1 through 196 herein.

198. A valid contract existed between Augusta and Miller & Schroeder.  Valid contractual relationships also existed between Augusta and his clients.  Defendants knew of the existence of these contracts.  Defendants' actions and breaches of duty described herein prevented and/or interfered with Augusta's performance under these contracts and with Augusta's realization of the benefits of these contracts.  The Defendants at all times intentionally interfered with and disrupted and intended to adversely affect Augusta's contractual relations.

199. In the alternative, it was reasonably foreseeable that Defendants' actions would interfere with or disrupt these relationships, such that Augusta was and would be denied the economic benefits of the contracts to which he was entitled.  Defendants' by their actions described above were negligent and breached their duty(ies) and/or failed to exercise due care with respect to Augusta

200. As a result of Defendants' intentional and/or negligent interference with Augusta's contractual relations, Augusta suffered damages and financial loss, to be proven at trial.

### SEVENTH CAUSE OF ACTION
**Aiding & Abetting Breach of Fiduciary Duty**
**(Against All Defendants)**

201. Plaintiff incorporates Paragraphs 1 through 200 herein.

202. Each Defendant had knowledge of fiduciary duties that the Miller & Schroeder Defendants assumed and/or otherwise owed to Augusta.

203. The Defendants by their actions either negligently or intentionally substantially assisted the other Defendants in carrying out the actions and breaches of fiduciary duty set forth herein against the Augusta.   Defendants' actions aided and abetted the other Defendants' breaches of fiduciary duties owed to Augusta.

204. As a direct and legal result of these Defendants' actions, Augusta has suffered damages to be determined at trial.

### EIGHTH CAUSE OF ACTION
**Breach of Contract**
**(Against the Miller & Schroeder Entity Defendants)**

205. Plaintiff incorporates Paragraphs 1 through 204 herein.

206. At all times there existed between Augusta and Defendants a valid contract as set forth above to underwrite and to provide Augusta with legitimate, well-researched, properly and legally operated, researched, suitable and honest bond offerings to sell to his clients, which Augusta would offer and sell to his 'book of business" for his own, Defendants', and the clients' benefit.  That contract contained an implied covenant of good faith and fair dealing, as well.

207. By their actions Defendants have breached said contract and the covenants, express and implied, therein, causing Augusta damages in an amount to be proven at trial.

### NINTH CAUSE OF ACTION

**Breach of Contract - Indemnity**
**(Against the Miller & Schroeder Entity Defendants)**

208. Plaintiff incorporates Paragraphs 1 through 207 herein.

209. Defendants entered into a written, oral, and/or implied agreement to indemnify and defend Augusta for, and hold Augusta harmless against, any and all claims made by his clients for damages caused by Defendants' actions in connection with the Heritage Bonds, and to act in good faith in connection with these indemnity obligations.

210. By their actions Defendants have breached said contract and the covenants, express and implied, therein, causing Augusta damages in an amount to be proven at trial.

**TENTH CAUSE OF ACTION**
**(Violation of Labor Code §2802 et seq.)**
**(Against the Miller & Schroeder Defendants)**

211. Plaintiff incorporates Paragraphs 1 through 210 herein.

212. All the actions of Augusta described herein, and all the actions of Augusta relative to the Heritage Bonds, were done by him as Defendants' employee and in the discharge of his duties as Defendants' employee, and his obedience to the directions of Defendants. Augusta did not know, understand or believe Defendants' actions to be unlawful. By law Defendants, as Augusta's employer(s), are and were obligated to indemnify Augusta for all necessary expenditures, or losses incurred by Augusta in direct consequence of his duties for, and/or of his obedience to the directions to, these Defendants. By their actions herein these Defendants have willfully breached these obligations, and have willfully attempted to circumvent these obligations in violation of the spirit of the law, in order to avoid these obligations but at the same time preserve for themselves the fruits of Augusta's actions.

213. As a direct result of Defendants' breach and violation of Labor Code Section 2802 Augusta has sustained loss and damages, and potential loss and damage, in the form of attorneys fees in the defense of lawsuits caused by Defendants' misconduct, in the form of verdicts or judgments or potential judgments against him, and in the form of damages in the form of lost salary, benefits, bonuses, emotional and physical injury and injury to Augusta's

1    physical and mental health, and other damages to be proven at trial.

2    / / /

3    / / /

4    / / /

5    **ELEVENTH CAUSE OF ACTION**
**Unlawful Business Practices/Unfair Competition**
6    **(Against All Defendants)**

7    214. Plaintiff incorporates Paragraphs 1 through 213 herein.

8    215. This cause of action is brought pursuant to Business & Professions Code H17200

9    et seq.   The conduct of Defendants detailed above constitutes unfair, unlawful and/or

10    fraudulent business practices and unfair competition within the meaning of Business &

11    Professions Code § 17200.   Defendants' conduct violated State and Federal Securities

12    Statutes, the common law, and the California Labor Code as set forth above.

13    216. Pursuant to Bus. & Prof. Code §17203, Augusta seeks from Defendants, and each

14    of them, restitution of its investment as a result of Defendants' conduct in violation of

15    H17200 et seq.

16    217. Pursuant to Bus. & Prof. Code §17203, Augusta seeks an order of this Court

17    enjoining the Defendants, and each of them, as well as their agents, employees,

18    representatives, and all persons acting in concert or participating with them, from continuing

19    to benefit from or receive the benefits from these transactions or otherwise employ the

20    wrongful conduct which constitutes violations of section 17200 et seq. as described herein.

21    Defendants have take such actions with respect to other companies, as well, and will

22    continue to do so.

23

24    **TWELFTH CAUSE OF ACTION**
**Equitable Indemnity & Declaratory Relief**
25    **(Against All Defendants)**

26    218. Plaintiff incorporates Paragraphs 1 through 217 herein.

27    219. Augusta now faces claims from, and potential and actual liability to, his clients

28    based entirely on Defendants' negligence and other wrongful acts in connection with the

1   Heritage Bond underwritings, along with attorneys' fees and other costs incurred in

2   connection with the defense of those claims.  If in fact Augusta is found liable to any of his

3   clients to whom he sold the Heritage Bonds, plaintiff contends such liability is secondary

4   and passive in nature, and is based upon the negligent conduct or other wrongful conduct

5   of Defendants, and each of them, and that plaintiff is entitled to full indemnification

6   pursuant to contract or equity against Defendants.  Plaintiff further alleges that Augusta sold

7   such bonds to his clients only in reliance on Defendants' due diligence, underwriting

8   activities, good faith, and promises to defend and indemnify Augusta from Defendants'

9   negligence and other wrongful acts in connection with the Heritage Bonds.

10   220. In addition Defendants by their actions caused damages and harm to Augusta and

11   by those actions are required by equity to indemnify Augusta from the consequences of their

12   actions.  Defendants have failed and refused and continue to fail and refuse to defend and/or

13   indemnify Augusta from damages caused by Defendants' own negligence and other

14   wrongful acts in connection with the Heritage Bonds underwritings.

15   221. Plaintiff desires a judicial determination of the indemnity rights and duties of

16   Augusta and Defendants, and each of them, under the rules of equity or contract, and

17   plaintiff further desires a declaration that Defendants and each of them are obligated to

18   defend and indemnify Augusta against any and damages, judgments, and/or other awards

19   which may be recovered against Augusta related to the Heritage Bonds.  Plaintiff also

20   desires a declaration from this court that the responsibility for the flawed Heritage Bonds,

21   and Augustas' clients' losses resulting from their purchases of those Bonds, was the fault of

22   Defendants and/or others, and was in no way the responsibility of Augusta, and plaintiff

23   thereon seeks an appropriate order that the reference (s) to these claims be expunged from

24   Augusta's NASD professional record.

### THIRTEENTH CAUSE OF ACTION
**To Set Aside Fraudulent Conveyances**
**(Against the Miller & Schroeder Defendants)**

28   222. Plaintiff incorporates Paragraphs 1 through 221 herein.

223. Augusta is and was a creditor as defined in Civil Code Section 3439.01. These Defendants were and are debtors as defined in Civil Code Section 3439.01. By their actions described above these Defendants made transfers of assets with the actual intent to hinder, delay or defraud Augusta.

224. By their actions described above these Defendants made transfers of assets without receiving a reasonably equivalent value in exchange for the transfer or obligation, and were engaged in or about to engage in a business or transaction for which the remaining assets of these Defendants were unreasonably small in relation to the business or transaction, or intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due. Defendants' actions constituted fraudulent transfers as defined in Civil Code Section 3439.04.

225. On account of Defendants' fraudulent transfer(s) plaintiff is entitled to and hereby seeks avoidance of the fraudulent transfers to the extent necessary to satisfy Augusta's claim for damages and indemnity from the claims by Heritage Bondholders. Plaintiff hereby seeks all other relief to which he is entitled pursuant to Civil Code Section 3439.07 and as circumstances require.

**FOURTEENTH CAUSE OF ACTION**
**Conspiracy**
**(Against all Defendants)**

226. Plaintiff incorporates Paragraphs 1 through 225 herein.

227. Defendants, for the purposes of selling the herein mentioned bond series at a profit knowingly entered into a conspiracy to defraud Debtor Mark Augusta, his clients, and all other purchasers of the Heritage Bond series by entering into an extensive campaign of misrepresentations of material fact concerning the value of the bonds themselves, the underlying properties, and other material facts upon which the value of the bond series were based including, but not limited to: (1) overstating the collateral represented by the underlying real estate project securing the individual Heritage bonds; (2) misstating the background and experience of the Heritage bond promoters and managers; (3) concealing

1   the undisclosed financial relationship between the Heritage bond promoters and the Miller

2   & Schroeder Defendants in the form of undisclosed loans from Miller & Schroeder, and

3   their repayment from bond proceeds; (4) conducting a course of business to conceal

4   development delays and cost overruns that were extraordinary as compared with the promise

5   construction cost "guarantee" and performance bonds described in the official statements,

6   for Heritage bond offerings, structured, finance, and marketed by the Miller & Schroeder

7   Defendants and (5) diverting bond proceeds from real estate projects for which the bonds

8   were sold to Defendants own uses and to other real estate projects to create the impression

9   that the Heritage bond promoters were successful promoters, developers and operators of

10  health care facilities when in fact the entire operation was a sham and/or a Ponzi scheme

11  whereby new bond offerings were being conducted to finance projects other than the project

12  identified in the official statements..

13      228. Defendants, and each of them, attempted to and intended to perfect an arrangement,

14  accommodation, inclusion between themselves whereby they might carry on the venture,

15  or might abandon same at any time and all loss would fall on purchasers such as Debtor

16  Mark Augusta, his clients, or other bonafide purchasers of the Heritage bond series, who

17  might be induced to buy or give credit on good faith of the enterprise.

18      229. As approximate result of the above described acts by Defendants, Debtor Mark

19  Augusta has been prevented from obtaining indemnity, his clients and other purchasers have

20  been deprived of reasonable investment proceeds and all have suffered monetary loss.  In

21  addition Mark Augusta has suffered loss to his professional reputation.

22      230. In doing things herein alleged, Defendants acted with malice, oppression, and fraud

23  by willfully and intentionally engaging in conduct intended to cause injury to purchasers of

24  the Heritage bond series.  Defendants are therefore guilty of malice, oppression and fraud

25  in conscious disregard of the rights of the bond purchasers, thereby warranting an

26  assessment of punitive damages in the amount appropriate to punish defendants and to deter

27  others from engaging in similar misconduct.

28

1

**PRAYER**

2  WHEREFORE, the Plaintiff prays for judgment as follows:

3     1.  For a judgment of total or partial indemnity or contribution against the Defendants.

4     2.  For declaratory relief.

5     3.  For an award of actual, economic, general, compensatory and punitive damages

6  against the Defendants according to proof.

7     4.  For an award of attorneys fees and costs, as well as an award of all costs incurred in

8  defending the underlying claims.

9     5.  For such other and further relief the Court may grant.

10

11                            Respectfully submitted,

12                            SPARBER RUDOLPH ANNEN

13

14  Dated: June 15, 2004      By:/s/ Richard J. Annen

                               Richard J. Annen, Esq. (SB #91956)

15                            Todd R. Gabriel, Esq. (SB #119750)

                               Michael W. Jacobs, Esq. (SB #174885)

16                            Attorneys for Plaintiff Gerald H. Davis, Trustee

17

18

19

20

21

22

23

24

25

26

27

28

5189-10/202291.3

69